Merry Lou **SHAW, et al., Plaintiffs, Appellants,**

v.

**DIGITAL EQUIPMENT CORP., et al., Defendants, Appellees.**

Leonard **WILENSKY, et al., Plaintiffs, Appellants,**

v.

**DIGITAL EQUIPMENT CORP., et al., Defendants, Appellees.**

Nos. 95–1995, 95–1996.

United States Court of Appeals, First Circuit.

Heard Feb. 8, 1996.

Decided May 7, 1996.

---

1196

Sanford P. Dumain, with whom David J. Bershad, James P. Bonner, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Glen DeValerio, Kathleen Donovan–Maher, Berman, DeValerio & Pease, Boston, MA, Richard Schiffrin, Schiffrin & Craig, Ltd., Buffalo Grove, IL, Joseph D. Ament, and Much, Shelist, Freed, Denenberg, Ament, Bell & Rubenstein, P.C., Chicago, IL, were on brief, for Shaw appellants.

Thomas G. Shapiro, with whom Edward F. Haber, Shapiro, Grace, Haber & Urmy, Boston, MA, Glen DeValerio, Kathleen Donovan–Maher, Berman, DeValerio & Pease, Boston, MA, Fred Taylor Isquith, Peter C. Harrar, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York City, Richard Bemporad, and Lowey, Dannenberg, Bemporad & Selinger, P.C., New York City, were on brief, for Wilensky appellants.

Edmund C. Case, with whom Jordan D. Hershman, Deborah S. Birnbach, Testa, Hurwitz & Thibeault, Boston, MA, John D. Donovan, Jr., Randall W. Bodner, Daniel J. Klau, and Ropes & Gray, Boston, MA, were on brief, for Shaw appellees.

Edmund C. Case, with whom Jordan D. Hershman, Deborah S. Birnbach, Testa, Hurwitz & Thibeault, Boston, MA, John D. Donovan, Jr., Randall W. Bodner, Daniel J. Klau, Ropes & Gray, Boston, MA, Gerald F. Rath, Robert A. Buhlman, Bingham, Dana & Gould, Boston, MA, Michael J. Chepiga, Daniel A. Shacknai and Simpson, Thacher & Bartlett, New York City, were on brief, for Wilensky appellees.

TORRUELLA, Chief Judge, CYR and LYNCH, Circuit Judges.

LYNCH, Circuit Judge.

Plaintiffs, purchasers of the securities of Digital Equipment Corp., appeal from the district court's dismissal of two consolidated class actions alleging violations of the federal securities laws. Both complaints assert that there were misleading statements and non-disclosures in the registration statement and prospectus prepared in connection with a public offering of stock. That offering commenced on March 21, 1994, just 11 days prior to the close of the quarter then in progress, and about three weeks prior to the company's announcement of an unexpectedly negative earnings report for that quarter. One of the complaints further alleges that defendants made fraudulently optimistic statements to the public in the period leading up to the offering. The district court found that neither complaint identified any statements or omissions actionable under the securities laws and dismissed both for failure to state a claim. We agree that many of the alleged misstatements and omissions do not provide a legally cognizable basis for the plaintiffs' claims, but we also conclude that a limited set of allegations in both complaints relating to the registration statement and prospectus for the March 1994 offering does state a claim. We further find that the surviving portions of the complaints satisfy the pleading requirements of Fed.R.Civ.P. 9(b). Accordingly, we affirm the district court's decision in part, reverse in part, and remand for further proceedings.

## I.

### Background

Digital Equipment Corporation ("DEC") is one of the world's largest suppliers of computer hardware, software and services. Founded in 1957, it first became a publicly held company in 1966. By the early 1990's, the company's success had burgeoned into $14 billion in yearly revenues. The company's success story, however, would not last forever. By 1992, the company had fallen on hard times. In January 1992 it reported its first-ever quarterly operating loss of $138.3 million. Faced in the ensuing months with operating losses in the range of $30 million to $311 million per quarter, the company decided to engage in radical surgery, cutting loose some 35,000 employees over the course of 15 months in the process, including its founder and CEO. To cover the costs of these actions, the company accumulated "restructuring" charges totalling close to $3.2 billion in fiscal years 1990–1992 combined.

In the midst of its financial woes, however, the company took some steps to restore its health. In February 1992, DEC had introduced a new product, the "Alpha" chip. The Alpha chip was hailed as a technological advance that could potentially restore the company's fortunes. In mid–1992, the company installed a new CEO, Robert B. Palmer. He took the helm in the fall of that year, as the company continued to implement strategies to help its Alpha technology gain acceptance in the marketplace and to bring the company back to financial vitality. At the time Palmer took over, the company had absorbed over $3 billion in losses for the prior three years and had been losing money at the rate of approximately $3 million per day. Under the new management, it appeared that the company's financial hemorrhaging had finally begun to slow.

On January 14, 1993, DEC reported a loss for the second quarter of fiscal year 1993 that was far smaller than had been anticipated by analysts. That promising result was followed by another quarter of losses, but within Wall Street's expectations. Then, on July 28, 1993, the company announced its first profitable quarter since before the 1992 fiscal year, reporting a net profit of $113.2 million for the fourth quarter of fiscal year 1993. That result was slightly below analysts' expectations, but a stark improvement over the operating loss of $188.1 million (and overall loss of $2 billion) reported for the comparable quarter in the prior year.

Still, on October 20, 1993, DEC announced a loss of $83.1 million for the first quarter of 1994, an improvement over the $260.5 million loss for the same quarter the prior year, but worse than analysts had been predicting. On January 19, 1994, the company announced another setback, reporting losses for the second quarter of fiscal year 1994, ending January 1, 1994, of $72 million. The loss was worse than analysts had expected and was virtually identical to the losses for that period the prior year.

It was against this backdrop that DEC, on January 21, 1994, filed with the SEC a "shelf" registration statement giving the company the option to issue up to $1 billion in various classes of debt and equity securities. Two months later, DEC through its underwriters conducted an offering of $400 million in depositary shares of preferred stock, pursuant to the "shelf" registration, a prospectus dated March 11, 1994, and a prospectus supplement dated March 21, 1994. The offering commenced on the date of the prospectus supplement and closed one week later on March 28, 1994, four days before the end of the third fiscal quarter. All 16 million depositary shares of preferred stock were sold, at an offering price of $25. DEC raised a badly needed $387.4 million.[1]

Less than three weeks later, on April 15, 1994, DEC announced an operating loss of over $183 million for the quarter that had ended on April 2, 1994. This third quarter loss was far greater than analysts had been expecting, and the largest that the company had reported since the first quarter of fiscal 1993. It bucked the positive trend of reduced losses under the company's new management. The announcement sent the price of the newly distributed preferred stock tumbling from the offering price of $25 to $20.875 by the close of trading on April 15. The common stock fell from $28.875 to $23 during the same period, and to $21.125 by the close of the next trading day.

In its April 15 announcement, the company also disclosed that it had decided to "accelerate [its] on-going restructuring efforts" and "also consider further restructuring." This was despite a representation in the March 21 prospectus supplement that "[t]he Corporation believes that the remaining restructuring reserve of $443 million is adequate to cover presently planned restructuring actions." Eventually, following the close of fiscal year 1994, DEC announced on July 14, 1994 that it would cut almost one-fourth of its remaining workforce and take an additional charge of $1.2 billion for fiscal year 1994 (beyond the $443 million remaining in reserve as of March 21) to cover the costs of additional restructuring activities.

---

1. Because the offering was conducted pursuant to a "firm commitment" underwriting arrangement, DEC sold all of the offered shares to the underwriters at a discount, who then in turn sold the shares to the public. Thus, DEC's proceeds were less than the total offering amount.

## II.

### Description of the Actions

These two lawsuits were filed on Tuesday, April 19, 1994, two business days after the company's announcement of April 15, 1994. One, the *Wilensky* action, brought on behalf of all persons who purchased shares in the March 1994 public offering, asserts claims under Sections 11, 12(2), and 15 of the Securities Act of 1933 ("Securities Act") against DEC, its Chief Executive Officer (Robert B. Palmer), its Chief Financial Officer (William Steul), and seven underwriting or investment banking firms, representing a purported defendant class of 65 underwriters who participated in the offering. The second, the *Shaw* action, advances claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5, and a pendent claim of common law negligent misrepresentation, on behalf of all purchasers of DEC common stock between January 19 and April 15, 1994 (the "Class Period").

At the heart of both complaints are two sets of claims. First, plaintiffs assert that DEC management had knowledge of material facts concerning the large losses developing during the third fiscal quarter of 1994, and that the defendants were under a duty to disclose such material information to the market in connection with the public offering conducted on March 21, 1994. Second, both the *Wilensky* and *Shaw* plaintiffs contend that the representation made in the March 21 prospectus supplement concerning the "adequacy" of the then-remaining "restructuring reserve" was materially misleading. The *Shaw* plaintiffs allege, additionally, that throughout the Class Period, the defendants made fraudulently optimistic statements to the public concerning DEC's future prospects in order artificially to inflate the market value of DEC shares, and that these statements were actionably false or misleading.

The defendants filed motions to dismiss under Fed.R.Civ.P. 9(b) and 12(b)(6). The district court consolidated the cases, stayed all discovery, and then dismissed both actions. The district court ruled, inter alia, that defendants had violated no duty to disclose and that the defendants' statements were not misleading, bespoke caution, or were otherwise not actionable as a matter of law. The court granted the defendants' motions to dismiss under Rule 12(b)(6), without reaching whether the complaints satisfied the pleading requirements of Rule 9(b). These appeals followed. We affirm in part and reverse in part. For clarity, we discuss each of the two actions in turn.

## III.

### The Section 11 and 12(2) Claims
### (Wilensky Action)

Sections 11 and 12(2) are enforcement mechanisms for the mandatory disclosure requirements of the Securities Act of 1933. Section 11 imposes liability on signers of a registration statement, and on underwriters, if the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. Section 12(2) provides that any person who "offers or sells" a security by means of a prospectus or oral communication containing a materially false statement or that "omits to state a material fact necessary to make the statements, in the light of the circumstances under which they were made, not misleading," shall be liable to any "person purchasing such security from him." 15 U.S.C. § 77*l* (2).

The *Wilensky* plaintiffs assert claims under Sections 11, 12(2), and 15,[2] alleging that the registration statement and prospectus filed in connection with the March 1994 public offering contained materially false statements and omitted to state material information required to be provided therein. The thrust of the *Wilensky* complaint is that defendants knew, as of the March 21 date of the 1994 public offering, of material facts portending the unexpectedly large

---

**2.** Section 15 imposes derivative liability upon persons who "control" those liable under Section 11 or 12. *See* 15 U.S.C. § 77*o*.

losses for the third quarter of fiscal 1994 that were announced later, and that failure to disclose these material facts in the registration statement and prospectus violated Section 11. Additionally, the *Wilensky* plaintiffs contend that the statement in the registration statement and prospectus characterizing as "adequate" the company's then-remaining "restructuring reserve" of $443 million was materially false and misleading, in violation of both Sections 11 and 12.

The defendants parry by attempting to reduce plaintiffs' claims to an argument that the company was required to disclose its internal *forecasts* about the outcome of the third quarter. They argue that the plaintiffs' position is untenable because the securities laws impose no duty upon a company to disclose internal projections, estimates of quarterly results, or other forward-looking information. They also say that the statement concerning the adequacy of the company's restructuring reserves is not actionably misleading when considered in context. Finally, defendants contend that the complaint fails to allege sufficient facts establishing that DEC and the underwriter defendants were statutory "sellers" subject to liability under Section 12(2). We evaluate each set of arguments separately.

## A. Actionability of Alleged Nondisclosures Under Section 11

■ The proposition that silence, absent a duty to disclose, cannot be actionably misleading, is a fixture in federal securities law. *See, e.g., Backman v. Polaroid Corp.,* 910 F.2d 10, 13 (1st Cir.1990) (en banc). Equally settled is that accurate reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse. *See Serabian v.*

*Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 361 (1st Cir.1994); *Capri Optics Profit Sharing v. Digital Equip. Corp.,* 950 F.2d 5, 7–8 (1st Cir.1991). In short, the mere possession of material nonpublic information does not create a duty to disclose it. *See Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir. 1987) (citing *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980)).

■ To focus here on a duty to disclose in the abstract, however, would be to miss the obvious in favor of the obscure. This action arises out of an allegedly defective registration statement and prospectus filed in connection with a public stock offering. The obligations that attend the preparation of those filings embody nothing if not an affirmative duty to disclose a broad range of material information. *Cf. Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 686–87, 74 L.Ed.2d 548 (1983). Indeed, in the context of a public offering, there is a strong affirmative duty of disclosure.[3] *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976) (the Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings").

The question here is not whether defendants were under an abstract duty to disclose information—clearly, they were. The issue, rather, is whether the defendants had a specific obligation to disclose information of the type that the plaintiffs complain was omitted from the registration statement and prospectus. The task of deciding whether particular information is subject to mandatory disclosure is not easily separable from normative judgments about the kinds of information that the securities laws *should* require to be disclosed, which depend, in essence, on con-

---

3. In *Roeder,* this court alluded to three situations that could give rise to a duty to disclose material facts: (i) when an insider trades in the company's securities on the basis of material nonpublic information; (ii) when a statute or regulation requires disclosure; and (iii) when the company has previously made a statement of material fact that is false, inaccurate, incomplete, or misleading in light of the undisclosed information. *Roeder,* 814 F.2d at 27; *see also In re Time Warner,*

*Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *Backman,* 910 F.2d at 12–13; *Greenfield v. Heublein, Inc.,* 742 F.2d 751, 758 (3d Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985). We do not decide here whether these three situations are the only ones that could trigger a duty of disclosure, or whether they necessarily would do so in every case.

ceptions of materiality. *See generally* Victor Brudney, *A Note On Materiality and Soft Information Under the Federal Securities Laws,* 75 Va.L.Rev. 723, 728 (1989). For our purposes, it suffices to say that the determination of whether the alleged nondisclosures in this case provide a legally sufficient basis for the plaintiffs' claims cannot be severed from consideration of the basic policies underlying the disclosure obligations of the applicable statutes and regulations.

We conclude that we cannot say that DEC was not required to disclose material information concerning its performance in the quarter in progress at the time of the March 21, 1994 public offering. Nor can we conclude, as a matter of law and on these pleadings, that DEC was not in possession of such material nonpublic information at the time of the offering.

### 1. The Insider Trading Analogy

In understanding the nature of the disclosure requirements attending a public offering of stock, it is helpful to conceptualize DEC (the corporate issuer) as an individual insider transacting in the company's securities, and to examine the disclosure obligations that would then arise.

■ There is no doubt that an individual corporate insider in possession of material nonpublic information is prohibited by the federal securities laws from trading on that information unless he makes public disclosure. He must disclose or abstain from trading. *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.1968) (en banc), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *see also SEC v. MacDonald,* 699 F.2d 47, 50 (1st Cir.1983) (en

banc). A central justification for the "disclose or abstain" rule is to deny corporate insiders the opportunity to profit from the inherent trading advantage they have over the rest of the contemporaneously trading market by reason of their superior access to information. *See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 235 (2d Cir.1974); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.1968) (en banc).[4] The rule eliminates both the incentives that insiders would otherwise have to delay the disclosure of material information, and minimizes any efficiency losses associated with the diversion of resources by insiders to "beating the market." *See* Robert C. Clark, *Corporate Law* § 8.2, at 273–75 (1986); Frank H. Easterbrook & Daniel R. Fischel, *The Economic Structure of Corporate Law* 288 (1991) ("The lure of trading profits may induce people to spend a lot of effort and other resources 'beating the market'; ... [T]he prompt disclosure of information by the affected firm will extinguish the trading opportunity. When everyone knows the truth, no one can speculate on it." [5]).

The policy rationale for the "disclose or abstain" rule carries over to contexts where a corporate issuer, as opposed to an individual, is the party contemplating a stock transaction. Courts, including this one, have treated a corporation trading in its own securities as an "insider" for purposes of the "disclose or abstain" rule. *See, e.g., McCormick v. Fund American Cos., Inc.,* 26 F.3d 869, 876 (9th Cir.1994) (collecting cases) ("[T]he corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to

---

4. *See also* Brudney, *supra,* at 735 (noting that the other major justification for requiring trading insiders to disclose is to increase the quality and quantity of information available to investors, thereby facilitating efficiency in the allocation of capital).

5. Judge Easterbrook and Professor Fischel ultimately reject this beating-the-market concern as a justification for *mandatory* disclosure. They argue that companies normally will voluntarily disclose material bad news, because, among other reasons, if a company consistently fails to make such disclosure, the market will discount the value of the company's securities by the in-

creased probability that it is in possession of undisclosed material negative information, thereby increasing the company's long-run costs of raising capital. *Id.* at 288–89. However, as the authors also recognize, the argument for voluntary disclosure becomes considerably weaker in contexts where the short-term interests of the company's managers differ from its long-term interests, for example, where management is under pressure to engineer a rapid turnaround in the company's financial performance. *See id.* at 169 (discussing the "agency" problem in the context of tender offers).

its shareholders or refrain from trading with them."); *Rogen v. Ilikon Corp.,* 361 F.2d 260, 268 (1st Cir.1966); *Kohler v. Kohler Co.,* 319 F.2d 634, 638 (7th Cir.1963); *Green v. Hamilton Int'l Corp.,* 437 F.Supp. 723, 728–29 (S.D.N.Y.1977); VII Louis Loss & Joel Seligman, *Securities Regulation* 1505 (3d ed. 1991) ("When the issuer itself wants to buy or sell its own securities, it has a choice: desist or disclose."); 18 Donald C. Langevoort, *Insider Trading: Regulation, Enforcement & Prevention* § 3.02[1][d], at 5 (3d rel. 1994) ("Issuers themselves may buy or sell their own securities, and have long been held to an obligation of full disclosure.... Conceptually, extending the insider trading prohibition to instances of issuer insider trading makes perfect sense.").

▇▇▇▇ Just as an individual insider with material nonpublic information about pending merger or license negotiations could not purchase his company's securities without making disclosure, the company itself may not engage in such a *purchase* of its own stock, if it is in possession of such undisclosed information. *See, e.g., Rogen,* 361 F.2d at 268. By extension, a comparable rule should apply to issuers engaged in a stock *offering.* Otherwise, a corporate issuer selling its own securities would be left free to exploit its informational trading advantage, at the expense of investors, by delaying disclosure of material nonpublic negative news until after completion of the offering. *Cf.* Ian Ayres, *Back to Basics: Regulating How Corporations Speak to the Market,* 77 Va.L.Rev. 945, 959–60 (1991) (describing the argument that securities laws impose needed discipline, because companies do not always internalize the costs of failing to provide the market with accurate information that would lower stock prices).

### 2. *The Statutory and Regulatory Scheme*

Analogizing a corporate issuer to an individual insider subject to the "disclose or abstain" rule of insider trading law illustrates the policy reasons supporting a comparably strong disclosure mechanism in the context of a public offering. We look to the explicit statutory and regulatory framework to determine whether the Securities Act provides such a mechanism, and whether the *Wilensky* complaint states a legally cognizable claim for nondisclosure under Section 11.

Section 11 by its terms provides for the imposition of liability if a registration statement, as of its effective date: (1) "contained an untrue statement of material fact"; (2) "omitted to state a material fact required to be stated therein"; or (3) omitted to state a material fact "necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). The plaintiffs' claim of nondisclosure relies on the second of these three bases of liability. That predicate is unique to Section 11; neither Section 12(2) of the Securities Act nor Section 10(b) or Rule 10b–5 under the Exchange Act contains comparable language. It is intended to ensure that issuers, under pain of civil liability, not cut corners in preparing registration statements and that they disclose all material information required by the applicable statutes and regulations. *See Huddleston,* 459 U.S. at 381–82, 103 S.Ct. at 686–87; Harold S. Bloomenthal et al., *Securities Law Handbook* § 14.08, at 663 (1996 ed.) ("Congress ... devised Section 11 of the Securities Act as an in terrorem remedy that would ... encourage careful preparation of the registration statement and prospectus.").

The information "required to be stated" in a registration statement is spelled out both in Schedule A to Section 7(a) of the Securities Act, 15 U.S.C. §§ 77g(a), 77aa, and in various regulations promulgated by the SEC pursuant to its statutory authority.[6] Those rules and regulations are no less essential to the statutory scheme than the general outlines of

---

**6.** Section 7(a) of the Securities Act provides that the "registration statement, ... shall contain such other information, and be accompanied by such other documents, as the Commission may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a); *see also* 15 U.S.C. § 77j(d) (granting SEC similar authority with respect to prospectuses); 15 U.S.C. § 77s(a) (granting SEC broad authority to "make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this [Act], including rules and regulations governing registration statements and prospectuses").

the statute itself. *Cf. Touche Ross & Co. v. SEC,* 609 F.2d 570, 580 (2d Cir.1979).

In this case, DEC conducted its March 1994 public offering pursuant to a registration statement on SEC Form S–3. Item 11(a) of the instructions to Form S–3 [7] requires that the issuer (registrant) describe in the portion of the registration statement comprising the prospectus:

> *any and all material changes in the registrant's affairs* which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to security holders and which have not been described in a report on Form 10–Q or Form 8–K filed under the Exchange Act.

Instructions to Form S–3, Item 11(a) (emphasis added).

To understand the scope of the "material changes" disclosure requirement, it is helpful to understand the nature of Form S–3. Form S–3 is a streamlined registration form available only to certain well-capitalized and widely followed issuers about which a significant amount of public information is already available.[8] A registrant on Form S–3 accomplishes disclosure in part by incorporating in the prospectus by reference its most recent Form 10–K and Forms 10–Q filed pursuant to the Exchange Act. *See* Instructions to Form S–3, Item 12(a). Unlike registrants on more broadly available forms (such as S–1), a Form S–3 registrant is not required separately to furnish in the prospectus the information required by Item 303(a) of Regulation S–K, 17 C.F.R. § 229.303(a) ("Management's

discussion and analysis of financial condition and results of operations"),[9] because that information is presumed to be contained in the Exchange Act filings that Form S–3 incorporates by reference, which are themselves subject to the requirements of Regulation S–K.[10] The primary purpose of the "material changes" disclosure requirement of Item 11(a), then, is to ensure that the prospectus provides investors with an *update* of the information required to be disclosed in the incorporated Exchange Act filings, including the information provided in those filings concerning "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).

In this case, the date of the final prospectus for the March 1994 offering and the effective date of the registration statement was March 21, 1994.[11] Prior to that date, the end of DEC's latest fiscal year was July 3, 1993 (fiscal year 1993), and the last Form 10–Q filed by the company was for the quarter that had ended on January 1, 1994 (DEC's second fiscal quarter). The question, then, is whether the complaint contains sufficient allegations that defendants failed to disclose in the registration statement any information regarding "material changes" in DEC's "affairs" as of March 21, 1994, that had occurred since July 3, 1993 and had not been reported in the Form 10–Q filed for the second quarter of fiscal year 1994. If the *Wilensky* complaint adequately so alleges, then the complaint sets forth a cognizable claim of nondisclosure under Section 11,

---

7. The requirements of the registration forms prescribed by the SEC constitute an integral part of the regulatory disclosure framework. *See* 17 C.F.R. §§ 230.400, 230.401, 239.0–1 *et seq.*

8. To be eligible to register on Form S–3, an issuer must have been subject to public reporting requirements for at least one year, filed all reports required under the Exchange Act (such as Forms 10–Q and 10–K) timely during the past year, and must meet certain other requirements relating to financial strength and stability. *See* 17 C.F.R. § 239.13; *see also* Bloomenthal et al., *supra,* § 5.05[1][b], at 212–13.

9. Item 303(a) requires the disclosure, among other information, of "any known trends or uncertainties that have had or that the registrant rea-

sonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).

10. By contrast, a registrant on Form S–1 (which does not permit incorporation by reference) must independently furnish in the prospectus the information required by Item 303 of Regulation S–K. *See* Instructions to Form S–1, Item 11(h).

11. The effective date of the registration statement for purposes of Securities Act liability is the "speaking date" of the final prospectus. *See* Bloomenthal et al., *supra,* § 5.05[2][f] at 216. The parties do not dispute that March 21, 1994 was the effective date of the registration statement.

namely, that defendants failed to include in the registration statement information "required to be stated therein."

### 3. The Alleged Nondisclosures

Plaintiffs argue that defendants failed to comply with Item 11(a) by omitting three categories of information from the registration statement and prospectus. First, plaintiffs contend that defendants failed to disclose that DEC had embarked on a risky marketing strategy that involved slashing prices and sacrificing profit margins in the hopes of increasing "market penetration" of the company's Alpha chip products. Second, plaintiffs assert that defendants failed to disclose that under the company's compensation scheme, its sales representatives were being paid "double commissions," again to the detriment of the company's profit margins. Third, and most centrally, plaintiffs allege that, by the date of the March 21 offering, defendants were in possession of, yet failed to disclose, material knowledge of facts indicating that the third fiscal quarter would be an unexpectedly disastrous one. We dispose of the first two claims of nondisclosure, and then focus our discussion on the third.

#### a. Marketing Strategy

■ The defendants provide a decisive rejoinder to the plaintiffs' claim of nondisclosure concerning the "marketing strategy": the relevant aspects and consequences of the strategy were in fact prominently disclosed, both in the text of the prospectus and in documents incorporated by reference.[12] For example, in its Form 10–Q filing for the quarter ending October 2, 1993 (the first quarter of fiscal year 1994), the company explained its reported decline in gross profit margins as follows:[13]

The decline in product gross margin resulted from the decrease in product sales, a continued shift in the mix of product sales toward low-end systems which typically carry lower margins, competitive pricing pressures and unfavorable currency fluctuations, partially offset by manufacturing cost efficiencies.

The Corporation has adopted an aggressive, competitive price structure for its Alpha AXP systems. Given this pricing, as well as the factors described in the preceding paragraph, the Corporation expects to experience continued downward pressure on product gross margins.

This statement, in conjunction with related disclosures found elsewhere in the prospectus and incorporated filings relating to "competitive pricing pressures," declining gross profit margins, "competitive pricing actions taken by the Corporation," an "industry trend toward lower product gross margins," and "persistent intense pricing competition," together obviate the plaintiffs' claim that defendants failed to disclose the company's adoption of a price-cutting strategy to boost the "market penetration" of its Alpha-based systems.

#### b. "Double Commissions"

■ The plaintiffs' claim of a failure to disclose "double commissions" also fails to make out a Section 11 violation. To the extent that the claim comprises allegations of mismanagement,[14] it is not cognizable under the securities laws. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477–80, 97 S.Ct. 1292, 1302–05, 51 L.Ed.2d 480 (1977); In re Craftmatic Sec. Litig., 890 F.2d 628, 638–39 (3d Cir.1989) (stating that plaintiffs cannot circumvent Santa Fe by simply pleading a mismanagement claim as a failure to disclose

**12.** As required by Item 12 of the instructions to Form S–3, the March 11, 1994 prospectus specifically incorporated by reference the company's Form 10–K filing for fiscal year 1993 (as amended by Form 10–K/A dated March 11, 1994), and its Form 10–Q filings for the quarterly periods that ended on October 2, 1993 and January 1, 1994.

**13.** Since the complaint alleges nondisclosures in the registration statement and prospectus, the court may look to the text of those materials and

the incorporated SEC filings to determine whether the plaintiffs' allegations are well founded. See Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991). We discuss more fully later the circumstances in which a court may look outside the four corners of a complaint in deciding a motion to dismiss.

**14.** The complaint's assertion that "DEC implemented its commission program and set sales quotas without careful evaluation" is an example of such an allegation.

management practices); *see also Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir.1992). Otherwise, the claim fails for lack of any allegations establishing a plausible theory of materiality.

The complaint does not allege that "double commissions" have some intrinsic significance to investors. Plaintiffs complain, rather, that DEC failed to tell the market that the commission-based compensation scheme, instead of boosting sales as it was supposed to do, was contributing to the company's losses. This argument is problematic. As the complaint itself acknowledges, DEC publicly announced the switch from a salary-based compensation scheme to the incentive-based model that produced the double commissions. Furthermore, according to the complaint, the switch was made *not* during the third fiscal quarter of 1994, but some two years earlier, in *1992*. The plaintiffs do not allege that any material changes to the compensation scheme were implemented after that time. Whatever the bearing of DEC's incentive-based compensation scheme on the company's expenses in relation to its revenues, the investing public had at least a year's worth of hard financial data (through the second quarter of fiscal 1994) to evaluate whether the commission system was working to increase gross margins,[15] or instead, as plaintiffs allege, to shrink them. Plaintiffs do not allege that there were any material changes in the payment of commissions between the time of the March public offering and the last prior Form 10–Q filed by the company (for the second fiscal quarter of 1994), and so on their own theory the claim that DEC failed to disclose the payment of "double commissions" amounts to naught.

c. *Operating Results Prior to End of Quarter*

We turn to the complaint's central, overarching claim that defendants failed, in connection with the March public offering, to disclose material factual developments foreboding disastrous quarter-end results. In evaluating this claim, we accept *arguendo* the complaint's allegations [16] that DEC had in its possession as of the March 21 offering date nonpublic information concerning the company's ongoing quarter-to-date performance, indicating that the company would suffer unexpectedly large losses for that quarter. We ask, then, whether there was a duty to disclose such information in the registration statement and prospectus under the rubric of "material changes" under Item 11(a) of Form S–3. We focus upon the defendants' primary legal arguments on this point: that DEC was under no duty to disclose "intra-quarterly" results or any other information concerning its third quarter performance until after the quarter ended; and that defendants had no duty as of March 21, 1994 to disclose any internal projections or predictions concerning the expected outcome of the quarter.

A central goal underlying the disclosure provisions of the securities laws is to promote fairness and efficiency in the securities markets. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* —— U.S. ——, ——, 114 S.Ct. 1439, 1445, 128 L.Ed.2d 119 (1994) ("Together, the Acts embrace a fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of caveat emptor." (internal quotation omitted)); *In re LTV Sec. Litig.,* 88 F.R.D. 134, 145 (N.D.Tex.1980). The disclosure of accurate firm-specific information enables investors to compare the prospects of investing in one firm versus another, and enables capital to flow to its most valuable uses. *LHLC Corp. v. Cluett, Peabody & Co.,* 842 F.2d 928, 931 (7th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988); *cf. Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1323 (7th Cir.1988) (securities laws aim at ensuring the availability to the investing public of information not otherwise in the public domain). The availability of reliable firm-specific information is also

---

**15.** The payments made to sales representatives constituted a component of the company's quarterly expenses, and the aggregate effect of such payments could have been determined by examining the company's quarterly earnings data, as disclosed in the required SEC filings.

**16.** As discussed below, based on the character of the allegations in the *Wilensky* complaint, the plaintiffs' claims under the Securities Act are not subject to the pleading requirements of Fed. R.Civ.P. 9(b).

essential to the market's ability to align stock price with a security's "fundamental value." *See* Marcel Kahan, *Securities Laws and the Social Costs of "Inaccurate" Stock Prices,* 41 Duke L.J. 977, 988–89 (1992).

The need for issuers to disclose material information is crucial in the context of a public offering, where investors typically must rely (unless the offering is "at the market") on an offering price determined by the issuer and/or the underwriters of the offering. *See* Kahan, *supra,* at 1014–15 (explaining the heightened need to target disclosure requirements to companies engaged in public offerings). Accordingly, the disclosure requirements associated with a stock offering are more stringent than, for example, the regular periodic disclosures called for in the company's annual Form 10–K or quarterly Form 10–Q filings under the Exchange Act. *See id.* at 1014–15 & n. 163.

The need for complete and prompt disclosure is particularly keen when a corporation issues stock pursuant to a "shelf registration" under SEC Rule 415(a), as DEC did in its public offering of March 1994. *See* 17 C.F.R. § 230.415(a) (permitting registration of securities to be issued on a "continuous" or "delayed" basis). The shelf registration rule permits a company to file a single registration statement covering a certain quantity of securities (register securities "for the shelf"), and then over a period of up to two years,[17] with the appropriate updates of information,[18] issue installments of securities under that registration statement (take the securities "down from the shelf") almost instantly, in amounts and at times the company and its underwriters deem most propitious. *See* Clark, *supra,* at 751 (explaining that the shelf registration process enables firms to pinpoint the timing of offerings to the issuer's advantage); *see generally* Jeffrey N. Gordon &

Lewis A. Kornhauser, *Efficient Markets, Costly Information, and Securities Research,* 60 N.Y.U.L.Rev. 761, 819–20 (1985).

The social benefit of the shelf registration rule is that it can enable an issuer to decrease its costs of raising capital. *See* Clark, *supra,* at 751. The concomitant risk is that, by permitting securities to be offered on a "delayed" basis, the rule may adversely affect the quality and timeliness of the disclosures made in connection with the actual issuance of securities. *See* Shelf Registration, SEC Release Nos. 33–6499, 34–20384, 35–23122, 1983 WL 35832 (SEC), *2 ("Shelf Reg.Rel."); *see also* I Loss & Seligman, *supra,* at 355 ("The rationale for limiting the time during which registered securities may be sold is that investors need current information when considering an offering. To permit 'registration for the shelf' runs the risk that investors subsequently will be offered securities on the basis of outdated or stale information."). In response to these concerns, the SEC, in adopting Rule 415 in its current form, assured that "[p]ost-effective amendments [to the initial registration statement] and prospectus supplements [would] serve to ensure that investors are provided with complete, accurate and current information at the time of the offering or sale of securities." Shelf Reg.Rel., *supra,* 1983 WL 35832 (SEC), *9. The SEC explained that registrants would not be permitted "to use the shelf registration rule as a basis for omitting required information from their registration statements when they become effective." *Id.,* 1983 WL 35832 (SEC), *10.

Based on concerns about Rule 415's effect on the adequacy and timeliness of disclosure, the SEC chose to limit the availability of the rule, in the context of primary stock offerings, to the widely-followed companies (like DEC) that are eligible to register securities

---

17. A shelf registration under Rule 415 may only cover an amount of securities that "is reasonably expected to be offered and sold within two years from the initial effective date of the registration." 17 C.F.R. § 230.415(a)(2).

18. For example, Rule 415(a)(3) requires that a shelf registrant comply with Item 512(a) of Regulation S–K, 17 C.F.R. § 229.512(a)(1)(ii), which

requires that a registrant file a post-effective amendment to an initial registration statement "[t]o reflect in the prospectus any facts or events arising after the effective date of the registration statement ... which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement."

on SEC Form S–3.[19] *See* 17 C.F.R. § 230.415(a)(1)(x); Shelf Reg.Rel., *supra,* 1983 WL 35832 (SEC) at *5; I Loss & Seligman, *supra,* at 361 & n. 90. The theory was that the concerns about adequacy of disclosure were less prominent in the case of "S–3" registrants, because those companies are precisely the ones that in the ordinary course of their businesses "provide a steady stream of high quality corporate information to the marketplace and whose corporate information is broadly disseminated[ ] . . . and is constantly digested and synthesized by financial analysts." Shelf Reg.Rel., *supra,* 1983 WL 35832 (SEC), *5.

Defendants assert here that the disclosure requirements of the Securities Act and regulations, including Item 11(a) of Form S–3, should be interpreted so that they would *never* mandate the provision of current information about a company's performance in the quarter in progress at the time of a public offering, so long as the company satisfies its quarterly and annual periodic disclosure obligations under the Exchange Act. That argument cuts severely against the very reason the shelf registration rule was made available to issuers like DEC: that "S–3" companies would provide the market with a continuous stream of high quality corporate information. The rule permits offerings to be made on a "continuous" or "delayed" basis because it envisions "continuous" disclosure. It would be inconsistent with this rationale to permit an issuer to take refuge in its periodically-filed Forms 10–Q or 10–K to avoid the obligation to disclose current material facts in its shelf offering prospectus.

Absent some mechanism requiring a registrant to disclose internally known, material nonpublic information pertaining to a quarter in progress, the shelf registration procedure, by enabling the issuer to pinpoint the timing of its offering, would give a company anticipating a negative earnings announcement the ability to time its offerings of securities from the shelf to be completed prior to the public release of the known negative news. This would allow companies to exploit what amounts to a naked informational trading advantage. *Cf.* Gordon & Kornhauser, *supra,* at 819–20. Item 11(a) of Form S–3, by requiring the issuer to disclose current information concerning "material changes" from previously reported data, provides a mechanism—comparable in effect to the "disclose or abstain" rule governing insider trading—to prevent such strategic behavior.[20]

In the face of these concerns, DEC argues that the plaintiffs' claims of nondisclosure are without merit, because they seek to impose liability upon DEC for a failure to disclose its internal *projections* about the outcome of the third quarter of fiscal 1994. The federal securities laws impose no obligation upon an issuer to disclose forward-looking information such as internal projections, estimates of future performance, forecasts, budgets, and similar data. *See, e.g., In re VeriFone Sec. Litig.,* 11 F.3d 865, 869 (9th Cir.1993); *In re Convergent Technologies Sec. Litig.,* 948 F.2d 507, 516 (9th Cir.1991). Plaintiffs, however, insist that their Section 11 claim is concerned not with the nondisclosure of projections, but of current information that DEC allegedly had in its possession as of March 21, 1994 about "losses" the company was incurring in the ongoing quarter. Defendants respond, in turn, that under a system of quarterly reporting, "losses" cannot be realized until a quarter has ended, and that because the quarter in question did not end until April 2, 1994, whatever information DEC had as of March 21 concerning that quarter necessarily must have been forward-looking, in the nature of a projection or forecast, which it had no obligation to disclose.

DEC's argument elevates form over substance. DEC's assertion that companies do not realize "losses" as such until a quarter

---

19. As an exception to the Form S–3 limitation, the SEC also made the shelf registration rule available in certain other limited circumstances not relevant here. *See* 17 C.F.R. § 230.415(a)(1)(i)–(ix); Bloomenthal et al., *supra,* § 5.12[1] at 235–36; I Loss & Seligman, *supra,* at 362–63.

20. Of course, if the issuer desires not to disclose the information prior to quarter's end, then the flexibility of the shelf registration procedure permits the issuer to "delay" a planned offering until after the quarter is completed and the results from the quarter are publicly reported.

has ended is, of course, largely unexceptionable. But it does not follow that DEC's only information concerning the ongoing quarter as of March 21 must have been forward-looking. That contention relies on two faulty components. First, it assumes that plaintiffs could not adduce adequate evidence that defendants were actually in possession of material information about the ongoing quarter at the relevant time. Second, it assumes that the potential unreliability of inferences that could be drawn from current information about operating results as of eleven days before the end of a quarter absolutely protects that information from mandatory disclosure. The first premise is inconsistent with the standards governing a Rule 12(b)(6) motion to dismiss. The second confuses the issue of materiality with the duty to disclose.

Defendants posit, in essence, that there can never be a duty to disclose internally known, pre-end-of-quarter financial information, because any inferences about the quarter that might be drawn from such information could be rendered unreliable by later developments in the same quarter, such as a sudden surge of profitable sales. This position does not withstand scrutiny. Present, known information that strongly implies an important future outcome is not immune from mandatory disclosure merely because it does not foreordain any particular outcome. The question whether such present information must be disclosed (assuming the existence of a duty), poses a classic materiality issue: given that at any point in a quarter, the remainder of the period may not mirror the quarter-to-date, is there a sufficient probability that unexpectedly disastrous quarter-to-date performance will carry forward to the end of the quarter, such that a reasonable investor would likely consider the interim performance important to the overall mix of information available?

■ As desirable as bright-line rules may be, this question cannot be answered by reference to such a rule. To try to do so would be contrary to *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The Supreme Court there refused to adopt a bright-line approach to determine at what stage preliminary merger discussions create a sufficient probability of actual consummation to become material. *See id.* at 237–39, 108 S.Ct. at 986–88 (rejecting "agreement-in-principle" test). So here. We decline to adopt, as defendants would have us do, a hard and fast rule that current information concerning a company's operating experience is never subject to disclosure until after the end of the quarter to which the information pertains. Rather, the question is whether the nondisclosure of interim facts rendered the prospectus materially incomplete. An issuer's compliance with the periodic disclosure requirements of the Exchange Act does not *per se* preclude such undisclosed facts from being material.

■ By the same token, we reject any bright-line rule that an issuer engaging in a public offering is obligated to disclose interim operating results for the quarter in progress whenever it perceives a possibility that the quarter's results may disappoint the market. Far from it. Reasonable investors understand that businesses fluctuate, and that past success is not a guarantee of more of the same. There is always some risk that the quarter in progress at the time of an investment will turn out for the issuer to be worse than anticipated. The market takes this risk of variability into account in evaluating the company's prospects based on the available facts concerning the issuer's past historical performance, its current financial condition, present trends and future uncertainties. But, strong-form efficient market theories aside, the ability of market observers to evaluate a company depends upon the information publicly available to them. If, as plaintiffs allege here, the issuer is in possession of nonpublic information indicating that the quarter in progress at the time of the public offering will be an extreme departure from the range of results which could be anticipated based on currently available information, it is consistent with the basic statutory policies favoring disclosure to require inclusion of that information in the registration statement.

We do not mean to imply, however, that nondisclosure claims similar to those asserted by plaintiffs here can never be disposed of as a matter of law. In many circumstances,

the relationship between the nonpublic information that plaintiffs claim should have been disclosed and the actual results or events that the undisclosed information supposedly would have presaged will be so attenuated that the undisclosed information may be deemed immaterial as a matter of law. *Cf. VeriFone,* 11 F.3d at 867–70 (affirming dismissal of claim that registration statement allegedly failed to disclose information concerning development that came to light six months later); *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1439, 1449–50 (5th Cir. 1993) (affirming summary judgment disallowing claim that prospectus failed to disclose information of developments that matured four months later); *Convergent,* 948 F.2d at 509–11, 515–16 (same, where prospectuses in March and August 1983 allegedly failed to disclose negative developments announced in February 1984); *Zucker v. Quasha,* 891 F.Supp. 1010, 1012, 1018 (D.N.J.1995) (dismissing complaint based on alleged nondisclosure in March 31 registration statement of information relating to results of period ending July 2), *aff'd,* 82 F.3d 408 (3d Cir.1996) (table, No. 95–5428). In such circumstances, where the allegedly undisclosed information is sufficiently remote in time or causation from the ultimate events of which it purportedly forewarned, the plaintiff's claim of nondisclosure may be indistinguishable from a claim that the issuer should have divulged its internal predictions about what would come of the undisclosed information. *Cf. VeriFone,* 11 F.3d at 869 (characterizing plaintiffs' claims of nondisclosure of "adverse material facts and trends" as of March 13 as claims that defendants failed to disclose forecasts of news actually released to public on September 17).

Here, however, the prospectus in question was filed 11 days prior to the end of the quarter in progress. The results for that quarter turned out to be, by all accounts, the product of more than a minor business fluctuation. Accepting, as we must, the plaintiffs' allegation that DEC, by March 21, 1994, was in possession of information about the company's quarter-to-date performance (*e.g.,* operating results) indicating some substantial likelihood that the quarter would turn out to be an extreme departure from publicly known trends and uncertainties, we cannot conclude as a matter of law and at this early stage of the litigation that such information was not subject to mandatory disclosure under the rubric of "material changes" in Item 11(a) of Form S–3. We conclude, accordingly, that the *Wilensky* plaintiffs' complaint as to this theory states a legally cognizable claim under Section 11 of the Securities Act.[21]

### B. Actionability of Statement Concerning Restructuring Reserves

The *Wilensky* plaintiffs also allege that the registration statement and prospectus for the March 21 offering contained a materially false and misleading statement actionable under both Sections 11 and 12(2). They contend that the statement of DEC's "belie[f]" as to the "adequacy" of the then-remaining $443 million restructuring reserve "to cover presently planned restructuring actions" was false and misleading, in light of information contemporaneously known to the company.

---

**21.** It bears reemphasizing that the plaintiffs' claim is sustainable only to the extent it relates to the nondisclosure of "hard" material information, as opposed to "soft" information in the nature of projections. *See In re Verifone Sec. Litig.,* 784 F.Supp. 1471, 1482 (N.D.Cal.1992), *aff'd,* 11 F.3d 865 (9th Cir.1993); *see generally* 2 Loss & Seligman, *supra,* at 622 n. 66. But even though DEC had no obligation to disclose a forecast of results for the quarter in progress at the time of the offering, it was permitted to do so. If it had chosen to disclose such a forward-looking projection, and if the projection was made with reasonable basis and in good faith, it may have been protected by the SEC's safe harbor provision. *See* SEC Rule 175, 17 C.F.R. § 230.175;

*see also Arazie v. Mullane,* 2 F.3d 1456, 1468 (7th Cir.1993); *Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995); *cf.* Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, § 102, 109 Stat. 737, 749–55 (creating expanded statutory protection for forward-looking statements). Furthermore, had DEC chosen to disclose projected results, such a disclosure (if reasonable) could very well have rendered the "hard" interim information underlying the projection immaterial as a matter of fact or of law, unless the market would have had some reason to discredit the projection, thereby creating a substantial likelihood that a reasonable investor might still have found the underlying information important to the total mix of information available.

## 1. Background

The "restructuring reserve" referred to in the prospectus supplement originated as a $1.5 billion charge taken by DEC at the close of its fiscal year 1992 (ended June 27, 1992) as part of the company's ongoing efforts to streamline the company "to achieve a competitive cost structure." The reserve was intended to cover the anticipated costs of employee separations, facilities consolidations, asset retirements, relocations, and related expenses. The company had absorbed similar restructuring charges of $1.1 billion and $550 million in fiscal years 1991 and 1990, respectively.

During fiscal year 1993, DEC took a number of actions consistent with the $1.5 billion dollar reserve recorded at the end of fiscal year 1992. By the end of the fiscal year (July 3, 1993), the remaining reserve was reported to be approximately $739 million. During the first two quarters of the next fiscal year, the company continued to draw from the reserve, so that by the end of the second quarter (January 1, 1994), the reserve stood at approximately $443 million. In its Form 10–Q for that quarter, dated February 4, 1994 (and incorporated by reference into the registration statement and prospectus at issue here), DEC stated its belief that the $443 million reserve was "adequate" to cover restructuring activities planned at that time. This statement was repeated in the prospectus supplement dated March 21, 1994. The full statement, with its immediately surrounding context, was as follows:

> While spending for R & E [research & engineering] and SG & A [selling, general & administrative] is declining, the Corporation believes its cost and expense levels are still too high for the level and mix of total operating revenues. The Corporation is reducing expenses by streamlining its product offerings and selling and administrative practices, resulting in reductions in employee population, closing and consolidation of facilities and reductions in discretionary spending. The Corporation

believes that the remaining restructuring reserve of $443 million is adequate to cover presently planned restructuring actions. The Corporation will continue to take actions necessary to achieve a level of costs appropriate for its revenues and competitive for its business.

As events turned out, additional restructuring charges were in fact taken later in fiscal year 1994. At the time of the company's announcement on April 15, 1994 of the $183 million loss for the third fiscal quarter of 1994, defendant Palmer stated that he had already instructed management to "accelerate [the company's] on-going restructuring efforts" and that the company would "consider further restructuring to achieve [its] goals." In line with these statements, the company announced on July 20, 1994 (just after the close of fiscal year 1994) that it had decided to take an additional restructuring charge of $1.2 billion in fiscal year 1994 (ended June 30, 1994).

## 2. Whether the Statement Was Misleading

Although defendants were required to disclose the size of the remaining restructuring reserve in the registration statement and prospectus as affecting the company's liquidity and capital resources,[22] the characterization of the reserve as *adequate* was arguably voluntary. But whether voluntary or not, DEC's description of its belief as of March 21, 1994 that the remaining $443 million reserve was "adequate" carried with it an obligation to ensure that the representation was not misleading. *See Roeder,* 814 F.2d at 26; *cf. Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 365 (1st Cir.1994) ("[I]f a defendant characterizes ... reserves as 'adequate' or 'solid' even though it knows they are inadequate or unstable, it exposes itself to possible liability [under the securities laws]." (quoting *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 282 (3d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278

---

**22.** Item 303(a) of Regulation S–K requires the registrant to include in its Exchange Act filings (*e.g.,* Forms 10–Q and 10–K), which in turn are incorporated by reference into registration statements on Form S–3, a description of "trends or any known demands, commitments, events or uncertainties" affecting the registrant's liquidity, and of the registrant's "material commitments for capital expenditures." 17 C.F.R. § 229.303(a)(1)–(2).

(1992))); *cf. also In re Wells Fargo Sec. Litig.,* 12 F.3d 922, 930 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994). Plaintiffs assert that defendants failed to meet that obligation.

The undeniable purport of the "adequacy" statement is that DEC had no plans as of the date of the prospectus supplement to engage in actions that would require the taking of a restructuring charge beyond the $443 million then remaining in "reserve." This was false or misleading, plaintiffs say, because DEC knew as of March 21, 1994 that further restructuring actions would be necessary to put the company back on the right track after its impending third quarter setback, and that these actions would deplete the remaining reserve and require further restructuring charges to be taken. Defendants reply, as the district court noted, that whatever the natural implication of the "adequacy" statement, its context sufficiently "bespeaks caution" to render any misleading inference from the statement immaterial as a matter of law. We do not agree.

The "bespeaks caution" doctrine "is essentially shorthand for the well-established principle that a statement or omission must be considered in context." *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 364 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *see also Rubinstein v. Collins,* 20 F.3d 160, 167 (5th Cir.1994). It embodies the principle that when statements of "soft" information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the "soft" statements may not be materially misleading under the securities laws.[23] *See Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 (1st Cir.1991); *see also Harden v. Raffensperger, Hughes & Co.,* 65 F.3d 1392, 1404 (7th Cir.1995); *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1413–14 (9th Cir.1994) (collecting cases), *cert. denied,* —— U.S. ——, 116 S.Ct. 185, 133

L.Ed.2d 123 (1995); *Rubinstein,* 20 F.3d at 166–68; *In re Trump,* 7 F.3d at 371–72; *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 763 (2d Cir.1991). In short, if a statement is couched in or accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that the statement was materially misleading because it gave rise to that very inference may fail as a matter of law. *In re Trump,* 7 F.3d at 364.

Here, however, the bespeaks caution doctrine does not preclude a claim that the reserve "adequacy" statement was materially misleading. The "adequacy" statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact. In its forward-looking aspect, the statement suggests that DEC would take no further restructuring charges in the near-term future. In its present-oriented aspect, it represents that as of March 21, 1994, DEC had no current intent to undertake activities that would require any such further restructuring charges to be taken. To the extent that plaintiffs allege that the reserve "adequacy" statement encompasses the latter representation of *present fact,* and that such a representation was false or misleading when made, the surrounding cautionary language could not have rendered the statement immaterial as a matter of law. *See Harden,* 65 F.3d at 1405–06 (explaining that the bespeaks caution doctrine cannot render misrepresentations of "hard" fact nonactionable).[24]

Furthermore, to the extent that plaintiffs allege that the "adequacy" statement implies a hiatus on new restructuring charges for the near future, we do not think that the surrounding context warns against such an implication with sufficient clarity to be thought to bespeak caution. *See Fecht v. Price Co.,* 70 F.3d 1078, 1082 (9th Cir.1995), *cert. denied,* ——. U.S. ——, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996). The prospectus supple-

---

**23.** The doctrine has been codified in the Securities Litigation Reform Act, *supra,* Pub.L. No. 104–67, § 102, 109 Stat. at 750.

**24.** *Cf. also* Securities Litigation Reform Act, *supra,* Pub.L. No. 104–67, § 102, 109 Stat. at 750 (providing safe harbor to statements couched in cautionary language only if the statements are identified as forward-looking).

ment does state that DEC will "continue to take actions," but it is at best ambiguous whether those "actions" refer to any restructuring activities other than those "presently planned." Thus, one might easily interpret the purportedly cautionary statement, especially in light of the "adequacy" characterization, to mean that the company's ongoing "actions" will continue to be covered by the existing restructuring reserve. If it was true, as plaintiffs allege, that defendants knew as of March 21, 1994 that DEC's performance in the third quarter would precipitate actions on a scale and schedule that would necessitate the taking of additional restructuring charges, the "adequacy" statement may well have been materially misleading.

We cannot conclude, as a matter of law and on these pleadings, that the actionability of the "reserve adequacy" statement is precluded by a context that bespeaks caution. The cautionary statements to which defendants point did not provide an unambiguous warning of the possibility that DEC might take additional restructuring charges in the near future—as it turned out, a charge of $1.2 billion in the fiscal year then in progress. *See id.* at 1082 (bespeaks caution doctrine provides basis for dismissal as matter of law "only when reasonable minds could not disagree as to whether the *mix* of information in the [allegedly actionable] document is misleading" (emphasis in original)); *Rubinstein,* 20 F.3d at 167–68 (stating that questions of whether disclosures were sufficiently cautionary may not always be resolved as a matter of law). Accordingly, we hold that the district court erred in concluding that the plaintiffs' allegations pertaining to the prospectus supplement's description of the restructuring reserve as "adequate" fail to state a claim under Sections 11 and 12(2).[25]

*C. Whether Defendants Are Statutory "Sellers"*

 As an alternative basis for affirming the district court's dismissal of the Section 12(2) claim, defendants argue that the *Wilensky* plaintiffs have failed adequately to allege their status as statutory "sellers."[26] We conclude that the complaint adequately alleges "seller" status only as to the underwriter defendants. The dismissal of the Section 12(2) claim as to the other defendants will accordingly be affirmed.

In *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the Supreme Court described in detail the class of defendants who may be sued as "sellers" under Section 12(1) of the Securities Act. *See id.* at 641–44, 108 S.Ct. at 2075–77. Section 12(2) defines the persons who may sue and be sued thereunder in language identical to the language used in Section 12(1). Thus, *Pinter*'s analysis of "seller" for purposes of Section 12(1) applies with equal force to the interpretation of "seller" under Section 12(2). *See, e.g., Ackerman v. Schwartz,* 947 F.2d 841, 844–45 (7th Cir.1991); *In re Craftmatic Sec. Litig.,* 890 F.2d 628, 635 (3d Cir.1989); *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 536 (9th Cir.1989); *Wilson v. Saintine Exploration & Drilling Corp.,* 872 F.2d 1124, 1125–26 (2d Cir.1989); *Dawe v. Main St. Management Co.,* 738 F.Supp. 36, 37 (D.Mass.1990).

A person who "offers or sells" a security may be liable under Section 12 to any person "*purchasing* such security *from* him." 15 U.S.C. § 77*l* (2) (emphasis added). Although the "purchasing from" language in the statute literally appears to contemplate a relationship between defendant and plaintiff "not

**25.** Defendants argue that, as a matter of fact, the market was well aware in January 1994 or earlier that DEC might eventually be forced to take further restructuring charges in fiscal year 1994. This, however, does not address whether the disclosures in the prospectus supplement themselves "bespeak caution" as a matter of law. Moreover, the evidence cited by defendants on this point goes far beyond the allegations of the complaint. While evidence of actual market knowledge might be proper grist for the summary judgment mill on the question of materiali-

ty, it cannot normally be considered in evaluating whether the plaintiffs' complaint is legally sufficient to survive a motion to dismiss under Rule 12(b)(6).

**26.** The district court, having dismissed the plaintiffs' claims on other grounds, did not reach this issue. We may, of course, affirm the district court's dismissal on any independently sufficient ground. *See Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 13 (1st Cir.1994).

unlike traditional contractual privity," *Pinter,* 486 U.S. at 642, 108 S.Ct. at 2076, the *Pinter* Court held that Section 12 liability is not limited to those who actually pass title to the suing purchaser. *See id.* at 645, 108 S.Ct. at 2077–78. This is so because even "[i]n common parlance," a person may "offer or sell" property without actually passing title. *Id.* at 642, 108 S.Ct. at 2076. For example, a broker or agent who solicits a purchase "would commonly be said ... to be among those 'from' whom the buyer 'purchased,' even though the agent himself did not pass title." *Id.* at 644, 108 S.Ct. at 2077. Furthermore, because "solicitation is the stage at which an investor is most likely to be injured," *id.* at 646, 108 S.Ct. at 2078, the Court found it consistent with the policies of the statute to permit imposition of liability on a non-owner of securities who "successfully solicits"[27] the plaintiff's purchase of the securities, provided that the solicitor is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647, 108 S.Ct. at 2078.[28]

The *Pinter* Court limited its holding in ways that govern the result here. The Court held that the "purchasing ... from" requirement of Section 12 limits the imposition of liability to "the buyer's immediate seller," and thus, "a buyer cannot recover against his seller's seller." *Pinter,* 486 U.S. at 644 n. 21, 108 S.Ct. at 2077 n. 21 (citations omitted). Second, the Court stated that proof the defendant *caused* a plaintiff's purchase of a security is not enough to establish that the defendant "solicited" the sale for Section 12 purposes. *See id.* at 651, 108 S.Ct. at 2080–81 (explaining that "[t]he 'purchase from' requirement of § 12 focuses on the defendant's relationship with the plaintiff-purchaser" and rejecting use of a test under which defendant could qualify as a seller if he was a "substantial factor" in causing the transaction to take place). Finally, the Court indicated that a person's "remote" involvement in a sales

transaction or his mere "participat[ion] in soliciting the purchase" does not subject him to Section 12 liability. *See id.* at 651 n. 27, 108 S.Ct. at 2081. A defendant must be directly involved in the actual solicitation of a securities purchase in order to qualify, on that basis, as a Section 12 "seller." *See In re Craftmatic,* 890 F.2d at 636; *Capri v. Murphy,* 856 F.2d 473, 478–79 (2d Cir.1988); *Dawe,* 738 F.Supp. at 37.

We apply these principles to the *Wilensky* complaint. The March 1994 public offering was made pursuant to a "firm commitment" underwriting, as disclosed in the registration statement and prospectus supplement. The plaintiffs do not contend otherwise. In a firm commitment underwriting, the issuer of the securities sells all of the shares to be offered to one or more underwriters, at some discount from the offering price. Investors thus purchase shares in the offering directly from the underwriters (or broker-dealers who purchase from the underwriters), not directly from the issuer. In fact, the March 21, 1994 prospectus supplement represented that "[DEC] has agreed not to, directly or indirectly, sell, offer or enter into any agreement to offer or sell, shares of [the offered stock]."

Because the issuer in a firm commitment underwriting does not pass title to the securities, DEC and its officers cannot be held liable as "sellers" under Section 12(2) unless they actively "solicited" the plaintiffs' purchase of securities to further their own financial motives, in the manner of a broker or vendor's agent. *See Pinter* 486 U.S. at 644–47, 108 S.Ct. at 2076–79. Absent such solicitation, DEC can be viewed as no more than a "seller's seller," whom plaintiffs would have no right to sue under Section 12(2). *See id.* at 644 n. 21, 108 S.Ct. at 2077 n. 21; *PPM Am., Inc. v. Marriott Corp.,* 853 F.Supp. 860, 874–75 (D.Md.1994); Louis

---

**27.** Section 2(3) of the Securities Act defines "sale" or "sell" to include, among other notions, "every ... solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(3); *see Pinter,* 486 U.S. at 643, 108 S.Ct. at 2076.

**28.** The Court reasoned that where a person's motivation in persuading another to purchase securities is solely to benefit the buyer, it would be "uncommon to say that the buyer 'purchased' from him," and that such motivation makes it difficult to characterize the person's act as "solicitation." *Pinter,* 486 U.S. at 647, 108 S.Ct. at 2078–79.

Loss & Joel Seligman, *Fundamentals of Securities Regulation* 1000–01 (3d ed. 1995) ("[I]t seems quite clear that § 12 contemplates only an action by a buyer against *his or her immediate seller.* That is to say, in the case of the typical 'firm-commitment underwriting,' the ultimate investor can recover only from the dealer who sold to him or her." (emphasis in original; footnotes omitted)).

■ The factual allegations in the complaint supporting the purported status of DEC and the individual defendants as Section 12(2) sellers are sparse, and all pertain to those defendants' involvement in preparing the registration statement, prospectus, and other "activities necessary to effect the sale of the [ ] securities to the investing public." Under *Pinter*, however, neither involvement in preparation of a registration statement or prospectus nor participation in "activities" relating to the sale of securities, standing alone, demonstrates the kind of *relationship between defendant and plaintiff* . that could establish statutory seller status. *See Pinter*, 486 U.S. at 651 & n. 27, 108 S.Ct. at 2081 & n. 27; *Shapiro*, 964 F.2d at 286. Although the complaint also contains a conclusory allegation that each defendant "solicited and/or was a substantial factor in the purchase by plaintiffs" of securities in the offering, the Supreme Court specifically rejected a proposed test under which a defendant's being a "substantial factor" in bringing about a sale could establish statutory seller status. *See Pinter*, 486 U.S. at 651, 108 S.Ct. at 2080–81. Furthermore, the term "solicitation" is a legal term of art in this context. In deciding a motion to dismiss under Rule 12(b)(6), a court must take all well-pleaded facts as true, but it need not credit a complaint's "bald assertions" or legal conclusions. *Washington Legal Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 971 (1st Cir.1993) (quoting *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir.1992)).

Here it is undisputed that the public offering was conducted pursuant to a firm commitment underwriting, and plaintiffs' bald and factually unsupported allegation that the issuer and individual officers of the issuer "solicited" the plaintiffs' securities purchases is not, standing alone, sufficient.

While, on a different set of allegations, an issuer involved in a firmly underwritten public offering could be a "seller" for purposes of Section 12(2), we hold that the *Wilensky* complaint does not contain sufficient nonconclusory factual allegations which, if true, would establish that DEC or the individual defendants qualify as such. However, the complaint does adequately allege that the underwriter defendants directly sold securities to the plaintiffs (in the literal sense of passing title), consistent with the underwriting arrangements disclosed in the prospectus supplement of March 21, 1994. We conclude that the plaintiffs have adequately alleged statutory seller status as against the underwriter defendants, but not against DEC or the individual defendants.

## IV.

### *The Section 10(b) Claims*
### (*Shaw* Action)

The plaintiffs in the *Shaw* action assert claims under Sections 10(b) and 20(a) [29] of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The implied right of private action under Section 10(b) and Rule 10b–5 [30] complements the civil enforcement function provided by Sections 11 and 12(2) of the Securities Act by reaching beyond statements and omissions made in a registration statement, prospectus, or in connection with an initial distribution of securities, to create liability for false or misleading statements or omissions of material

---

**29.** Section 20(a) provides for derivative liability of persons who "control" others found to be primarily liable under the Exchange Act.

**30.** Section 10(b) proscribes the "use or employ[ment], in connection with the purchase or sale of any security, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission

may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b).

fact in connection with trading in the secondary market. *See Central Bank of Denver,* — U.S. at ——, 114 S.Ct. at 1445; *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1123–24 (7th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994).

In addition to proving that the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading, a Rule 10b–5 plaintiff, unlike a plaintiff asserting claims under Section 11 or 12(2) of the Securities Act, must establish that the defendant acted with scienter, and that the plaintiff's reliance on the defendant's misstatement caused his injury. *See Holmes v. Bateson,* 583 F.2d 542, 551 (1st Cir.1978); *see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 808 (2d Cir.1996). The same standard of materiality, however, applies to claims under Section 10(b) and Rule 10b–5 as to claims under Sections 11 and 12(2) of the Securities Act. *See Lucia v. Prospect St. High Income Portfolio, Inc.,* 36 F.3d 170, 172 n. 3 (1st Cir.1994). Finally, a plaintiff asserting securities fraud must plead the alleged "circumstances constituting fraud ... with particularity." Fed.R.Civ.P. 9(b).

The *Shaw* plaintiffs advance the same claims of nondisclosure and misstatement championed by the *Wilensky* plaintiffs. They allege further that those alleged nondisclosures and misstatements were made with fraudulent intent, that defendants' conduct artificially inflated the market price of DEC common stock, and that this fraud on the market caused the plaintiffs to suffer damages. The *Shaw* plaintiffs also allege that defendants committed actionable fraud by making optimistic statements to the public (outside of any SEC filing) concerning the company's prospects throughout the Class Period,[31] even though they knew or recklessly disregarded nonpublic information indicating that the company was then in dire straits, as was ultimately disclosed on April 15, 1994. The defendants respond that they were under no duty to disclose the information identified by plaintiff, and that none of the statements attributed to them was materially false, misleading, or otherwise actionable.

## A. Nonactionability of Loosely Optimistic Statements

The *Shaw* plaintiffs allege that the defendants made a number of fraudulently optimistic statements about DEC through media outlets (*e.g.,* newspapers and trade publications) and press releases issued by the company. The district court, after analyzing each of the statements identified by the plaintiffs, held as a matter of law that none was sufficiently material to support a claim of securities fraud. We agree.

In most circumstances, disputes over the materiality of allegedly false or misleading statements must be reserved for the trier of fact. *See Basic,* 485 U.S. at 236, 108 S.Ct. at 986; *Lucia,* 36 F.3d at 176. But not every unfulfilled expression of corporate optimism, even if characterized as misstatement, can give rise to a genuine issue of materiality under the securities laws. *See Lucia,* 36 F.3d at 176 (leaving open possibility that some materiality determinations may be made as a matter of law). In particular, courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.[32] *See, e.g., San*

---

31. The Class Period (here, January 19 through April 15, 1994) constitutes the time period during which members of the putative plaintiff class purchased shares of DEC common stock. We limit our analysis of the *Shaw* plaintiffs' claims of affirmative misrepresentation to the statements allegedly made by defendants within the Class Period. *See In re Clearly Canadian Sec. Litig.,* 875 F.Supp. 1410, 1420 (N.D.Cal.1995).

32. Under the common law of fraud, courts typically would find such statements to be mere "puffing" or sales talk upon which no reasonable person could rely, and thus to be legally insufficient to support a claim. *See, e.g., Greenery Rehabilitation Group, Inc. v. Antaramian,* 36 Mass. App.Ct. 73, 628 N.E.2d 1291, 1293 (1994), *rev. denied,* 417 Mass. 1103, 634 N.E.2d 120 (1994); *Webb v. First of Mich. Corp.,* 195 Mich.App. 470,

*Leandro,* 75 F.3d at 807, 811 (holding not actionable statement that the company "expect[ed] ... another year of strong growth in earnings per share"); *Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 213 (4th Cir.1994) (similar, where alleged fraudulent statement was: "[the company] is on target toward achieving the most profitable year in its history"); *In re Caere Corporate Sec. Litig.,* 837 F.Supp. 1054, 1057–58 (N.D.Cal.1993) ("[The company is] 'well-positioned' for growth."); *Colby v. Hologic, Inc.,* 817 F.Supp. 204, 211 (D.Mass.1993) ("Prospects for long term growth are bright.").

■ Review of vaguely optimistic statements for immateriality as a matter of law may be especially robust in cases involving a fraud-on-the-market theory of liability. In such cases, the statements identified by plaintiffs as actionably misleading are alleged to have caused injury, if at all, not through the plaintiffs' direct reliance upon them, but by dint of the statements' inflating effect on the market price of the security purchased. *See Basic,* 485 U.S. at 241–47, 108 S.Ct. at 988–92; *Rand v. Cullinet Software, Inc.,* 847 F.Supp. 200, 205 (D.Mass.1994). When the truth is disclosed and the market self-corrects, investors who bought at the inflated price suffer losses. Those losses can be deemed to have been caused by the defendants' statements, even absent direct reliance by plaintiffs, because the statements were presumptively absorbed into and reflected by the security's price. *See Basic,* 485 U.S. at 243–44, 108 S.Ct. at 989–90 (quoting *In re LTV,* 88 F.R.D. at 143).

■ This presumption of investor reliance on the integrity of stock prices has the primary effect of obviating the need for plaintiff purchasers to plead individual reliance. But by its underlying rationale, the presumption also shifts the critical focus of the materiality inquiry. In a fraud-on-the-market case the hypothetical "reasonable investor," by reference to whom materiality is gauged, must be "the market" itself, because it is the market, not any single investor, that determines the price of a publicly traded security. *See In re VeriFone Sec. Litig.,* 784

F.Supp. 1471, 1479 (N.D.Cal.1992) ("The fraud-on-the-market theory thus shifts the inquiry from whether an individual investor was fooled to whether the market as a whole was fooled."), *aff'd,* 11 F.3d 865 (9th Cir. 1993); *see also In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113–14 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990); *cf.* Easterbrook & Fischel, *Corporate Law, supra,* at 297 (explaining how unsophisticated investors "take a free ride on the information impounded by the market").

Thus, a claim that a fraud was perpetrated on the *market* can draw no sustenance from allegations that defendants made overly-optimistic statements, if those statements are ones that any reasonable investor (ergo, the market) would easily recognize as nothing more than a kind of self-directed corporate puffery. The market is not so easily duped, even granted that individual investors sometimes are. *See In re Apple Computer,* 886 F.2d at 1114; *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 515 (7th Cir.1989); *see also Raab v. General Physics Corp.,* 4 F.3d 286, 289–90 (4th Cir.1993) ("[T]he market price of a share is not inflated by vague statements predicting growth.... Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen." (citations omitted)). This is particularly so with respect to the securities of an actively traded and closely followed company like DEC. *Cf. LTV,* 88 F.R.D. at 144 (citing empirical studies demonstrating that assumptions about market efficiency are strongest with respect to "[t]the prices of stocks of larger corporations, such as those listed on the New York Stock Exchange").

While we have no occasion or intention to adopt here a *per se* rule that expressions of optimism uttered by corporate managers can *never* support a claim of securities fraud, we think that in this case, the statements outside of the registration statement and prospectus identified by plaintiffs as actionably misleading are—with one exception discussed sepa-

491 N.W.2d 851, 853 (1992); *Rodio v. Smith,* 123 N.J. 345, 587 A.2d 621, 624 (1991); *Hauter*

*v. Zogarts,* 14 Cal.3d 104, 111–12, 120 Cal.Rptr. 681, 534 P.2d 377 (1975) (en banc).

rately below—by their nature, too patently immaterial to support a fraud-on-the-market claim.

■■■■ We agree with the district court, for example, that a claim of securities fraud cannot lie on the basis of the statements made by defendant Steul (DEC's chief financial officer) in January 1994, in reaction to the disappointing earnings results for the quarter just ended. Steul was quoted as saying that the company's transition to selling its Alpha chip products was "going reasonably well" and that the company "should show progress quarter over quarter, year over year." We hold to be similarly not actionable (because patently immaterial) Steul's comment of January 19, 1994 that the company was "basically on track"; his comment of January 20, 1994 that "DEC was a very healthy company"; defendant Robert Palmer's statement of the same date that he was "confident that DEC was pursuing the right strategy"; and the February 8, 1994 statement by DEC's head of European operations (not a defendant here) that he was "pretty optimistic" that the company would "be able to stabilize [its] revenue" in the first half of calendar year 1994 and "start to grow revenue" in the second half. These statements all so obviously fail to pose any "substantial likelihood" of being "viewed by the reasonable investor"—let alone the market— "as having significantly altered the total mix of information available," *Basic*, 485 U.S. at 231–32, 108 S.Ct. at 983–84 (quotation omit-

ted), that they are properly deemed immaterial as a matter of law.[33]

### B. Importance of Context: the "Break–Even" Statements

■■■■ The *Shaw* plaintiffs allege that on January 20, February 23, and March 29, 1994, DEC made or was responsible for the following statements to the public, on those respective dates: "[w]e are operating very close to break-even"; "we're running very close to break-even"; and "we are very close to break-even." Plaintiffs assert that given the magnitude of the losses actually disclosed to the public on April 15, 1994, the "break-even" statements must have been false when made and constituted actionable fraud.

Putting aside whether plaintiffs have adequately alleged that these statements were made with fraudulent intent, the statements, when read in isolation, provide reason for pause. The statements cannot accurately be described as the kind of diffuse expressions of opinion or optimism that can be deemed, by their nature, obviously immaterial as a matter of law. Rather, they appear, in isolation, to be statements quantifying the company's current operating inflows as more or less approximating outflows, thus inviting an inference that the end results for the third quarter might turn out likewise. The rub, however, is the context surrounding the statements. When evaluated in context, the "break-even" statements do not give rise to a claim of securities fraud.

**33.** Plaintiffs additionally argue that several forward-looking statements allegedly made by defendants *prior* to the commencement of the Class Period (January 19, 1994) gave rise to a "duty to update," which defendants purportedly violated during the Class Period. Plaintiffs point to a statement by Steul in October of 1993 that the company's continuing restructuring actions over the fiscal year "will probably be smaller than the last four quarters"; a September 1993 statement that "[s]ervice revenues have continued to grow"; and a statement by defendant Palmer on November 4, 1993 that the prospect of turning a profit was a "reasonable expectation" in fiscal year 1994. Whatever the circumstances in which a company might be subject to a duty to "update" information previously disclosed, we do not think that the pre-Class Period statements identified by plaintiffs are of the kind that could trigger any such duty. The alleged statement regarding "service revenues" constitutes a state-

ment of historical fact not alleged to be false, and as such, does not provide the basis for a duty to update. *See Serabian*, 24 F.3d at 361. The other alleged statements are cautiously optimistic comments that would not be actionable in the first instance. *See San Leandro*, 75 F.3d at 811. They express, at most, "only the hope of any company" for a positive future, and "lack the sort of definite positive projections that might require later correction." *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *see also San Leandro*, 75 F.3d at 811 (finding no duty to update "subdued general comments" of optimism). Moreover, it seems likely that any "duty to update" DEC's pre-Class Period statements would have been extinguished by the company's disclosure of financial information in the negative earnings announcement of January 19, 1994, the first day of the alleged Class Period.

■ In deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment. *See Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir.1993) (explaining that the main problem of looking to documents outside the complaint—lack of notice to plaintiff—is dissipated "[w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint" (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)); *see also San Leandro*, 75 F.3d at 808–09; *Romani*, 929 F.2d at 879 n. 3. Were the rule otherwise, a plaintiff could maintain a claim of fraud by excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning to the allegedly wrongful statement. We look to the full context of the "break-even" statements attributed to DEC.[34]

The first time the "break-even" statement appeared was in a Boston Herald article headlined "Digital falls short with $72.1M loss," published on January 20, 1994, the day after DEC had announced its disappointing earnings results for the second quarter of fiscal year 1994. The article attributed the following statement to Steul:

> The $72 million loss represents only 2.2 percent of revenues, Steul said. "We are operating very close to break-even. It's a lot of money, but on the other hand it's small compared to what losses have been in the past." Steul would not say when Digital will again be profitable. "I hesitate to give you an estimate because we just have too much uncertainty in the immediate future" [paragraph structure omitted].

It is plain that Steul's "break-even" characterization refers to the fact that the $72 million loss that had just been reported for the *second* quarter of fiscal year 1994 was, in fact, only a small percentage of the company's total revenues. The statement cannot reasonably be understood as a material comment on the current status or anticipated results of the company's third quarter. Since plaintiffs do not allege that the characterization of "close to break-even" placed an actionably fraudulent spin on DEC's *second* quarter results, the statement in that context can be of no moment.

The second "break-even" statement appeared in a February 23, 1994 *Wall Street Journal* article. The article's author had obtained an "internal" DEC finance review, and divulged its contents as follows:

> "We're running very close to break-even," the [internal] review says, though "revenue is uncertain for next two-plus quarters." The review concludes that Digital "will still be in turnaround for the next two or three quarters" and that managers should "focus heavily on cash conservation." There is a chance, it adds, "if we keep at Q2 spending levels, that we can make a profit this fiscal year." While Mr. Palmer confirmed many of these points in an interview, he wouldn't make any forecast. "This is a large organization that was in deep trouble when I started, and we still have a way to go" [paragraph structure omitted].

The context of the "break-even" statement in the internal review, as reported, sufficiently bespeaks caution to render any forward-looking connotation that could otherwise be taken from the statement immaterial as a matter of law. *Cf. Polin v. Conductron Corp.*, 552 F.2d 797, 806 n. 28 (8th Cir.) (holding that statement by company that it "saw a 'possibility' of a break-even soon" was immaterial as matter of law, since it was phrased so as to "bespeak caution in outlook"), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977). Given the statements attributed to the internal review that "revenue is uncertain for next two-plus quarters"; that "[DEC] will still be in turnaround for the next two or three quarters"; that "we still have a way to go"; and given Palmer's reported refusal to

---

**34.** The full text of the news articles in which the "break-even" statements appeared, and which are cited in the complaint, have been provided to us in a jointly-prepared appendix. Plaintiffs have not objected to the district court's nor the defendants' making reference to the full text of those articles.

make any forecast, coupled with the absence of any specifics regarding the authoritativeness or timeliness of the "internal" report, no reasonable investor (nor the market) could have attached importance to any forward-looking connotation of the "break-even" statement described in the article.

A similar analysis applies to the "break-even" statement that appeared in the March 29, 1994 issue of *Financial World.* In that article, defendant Steul was quoted as saying "We are very close to break-even. If it hadn't been for currencies, and had we been able to ship everything ordered, we would have been in the black in the second quarter." As with the *Wall Street Journal* piece, neither the *Financial World* piece itself nor the *Shaw* complaint specifies the date on which the statement was actually made.[35] But, again, Rule 9(b) issues aside, the "break-even" comment is most naturally understood as looking backward to the second quarter of fiscal 1994, not to the future. Furthermore, to the extent that any other meaning could be discerned, it is directly negated by other qualifying comments attributed to Steul in the same article, including the following:

> What Digital needs at this point is time. Says Steul, "Wall Street always wants quick results, but it took a couple of years to get where we are and it will take more than a couple of quarters to turn it around."

This warning that favorable results would be slow to come is a far cry from a "prediction of a break-even year," which is how plaintiffs characterize Steul's comments. Additionally, because plaintiffs allege that a fraud on the market was committed by statements communicated in this financial analyst's article, it is only fair to note that the tenor of the article is one of skepticism about DEC's future prospects.[36] On the facts as alleged, the

district court did not err in concluding that the "break-even" statement in the *Financial World* piece was immaterial as a matter of law.

**C.** *Actionability under Section 10(b) of Omissions and Misleading Statements in the Registration Statement and Prospectus*

The remaining statements and omissions alleged by the *Shaw* plaintiffs to be fraudulent under Section 10(b) and Rule 10b–5 relate to the registration statement and prospectus for DEC's March 1994 stock offering. These alleged misstatements and omissions are identical to those that underlie the *Wilensky* plaintiffs' claims under Sections 11 and 12(2) of the Securities Act. We conclude that the *Shaw* plaintiffs may pursue their Section 10(b) claim based on these alleged defects in the registration statement and prospectus. Because we hold that the *Shaw* complaint survives Rule 12(b)(6) only to that extent, we also conclude that the putative class on whose behalf the *Shaw* complaint was brought must be narrowed accordingly.

 Material omissions and misleading statements in a registration statement and prospectus are, in addition to being actionable under the Securities Act by purchasers in the offering, also actionable under Section 10(b) and Rule 10b–5 by contemporaneous purchasers in the aftermarket, provided, of course, that the additional elements of liability (scienter and reliance) are established. *See In re Ames Dept. Stores Inc. Stock Litig.,* 991 F.2d 953, 963 (2d Cir.1993); *Fischman v. Raytheon Mfg. Co.,* 188 F.2d 783, 786–87 (2d Cir.1951); *cf. Huddleston,* 459 U.S. at 383, 103 S.Ct. at 688 ("[I]t is hardly a novel proposition that the 1934 Act and the 1933 Act 'prohibit some of the same conduct.'" (citation omitted)). In the context of a fraud-on-the-market claim, this

---

**35.** It is unclear whether the statement quoted in *Financial World* had been freshly made by Steul, or was recycled from pre-existing sources. The *Shaw* complaint does not specify.

**36.** For example, the article quotes statements by analysts expressing skepticism about DEC's prospects, and cautions: "Reasonable as [Steul's comments concerning a turn-around] may sound, recall that it was only last September

[1993] that Steul's boss boasted that Digital was on its way back after three years and over 83 billion of red ink." We need not decide here whether an allegedly misleading statement appearing in one source can be rendered immaterial as a matter of law, at the pleading stage, by third-party commentary in that or a different source.

**1222**

principle has a simple rationale. The registration statement and prospectus speak not only to those who purchase in the offering, but to the entire market. If an issuer's registration statement contains a misleading statement of fact about the company's financial condition or omits material information required to be disclosed, the impact of such statements or omissions, to the extent material, would not necessarily be limited to the securities covered by the registration statement. There is no logical reason that a registration statement and prospectus could not serve as a vehicle for an alleged fraud on the market, affecting all of the company's securities. Thus, even though the *Shaw* plaintiffs purchased shares of DEC common stock in the aftermarket, not shares of preferred stock in the offering, their fraud-on-the-market claims may properly encompass any material misstatements or omissions in the registration statement. *See In re Ames,* 991 F.2d at 963–64.

We hold, then, that the same allegations of misleading statements and omissions in the *Wilensky* complaint that state a claim under Sections 11 and 12(2) also form the basis of a cognizable claim under Section 10(b) and Rule 10b–5.[37] The allegations in the *Wilensky* complaint which we found lacking are similarly without force in the *Shaw* complaint.

### D. Limitation of the Shaw Class

Our conclusion that the *Shaw* complaint states a claim, but only to the extent it is based on the same statements and omissions that form the basis of the surviving claims in the *Wilensky* complaint, requires an important adjustment to be made. The *Shaw* plaintiffs allege that they were injured when they purchased DEC common stock at prices that were inflated as a result of misleading statements and omissions by DEC and the individual defendants. The named plaintiffs purport to represent a class of persons who purchased DEC stock between January 19 and April 15, 1994. However, because the only allegations in the *Shaw* complaint that state a claim are those that depend upon the purported misstatements and omissions in the registration statement as of its effective date—March 21, 1994—it follows that only those who purchased their shares *on or after* March 21, 1994 (and before April 15, 1994, when disclosure occurred) could have suffered cognizable injury.

Of the four plaintiffs named in the *Shaw* complaint, only Gary Phillips is alleged to have made his purchase within those two limiting dates; thus only his claim may be reinstated. The district court's dismissal of the claims of the three other named plaintiffs is affirmed. On remand, the district court should require the *Shaw* plaintiffs to amend their complaint to redefine the "Class Period" accordingly.

### V.

#### Rule 9(b)

Defendants argue, as an alternative basis for affirming the district court's dismissals, that both the *Wilensky* and *Shaw* complaints fail to meet the requirement of Fed.R.Civ.P. 9(b) that claims of fraud be pleaded with "particularity." We ask first whether the dictates of Rule 9(b) apply to the claims asserted in the *Wilensky* complaint, and answer in the negative. We then test the allegations of the *Shaw* complaint and conclude that it satisfies Rule 9(b).

#### A. Whether Rule 9(b) Applies to the Wilensky Complaint

Rule 9(b) mandates that "[i]n all averments of fraud ..., the circumstances consti-

---

**37.** In so holding, we do not intend to create a private right of action under Section 10(b) for violations of any SEC rule. Our holding is limited to the proposition that, in the context of a public offering, plaintiffs who (through the market) rely upon the completeness of a registration statement or prospectus may sue under Section 10(b) and Rule 10b–5 for nondisclosures of material facts omitted from those documents in violation of the applicable SEC rules and regulations. *Cf. Backman,* 910 F.2d at 12–13 (suggesting that

SEC regulations and insider trading may create a duty to disclose under Rule 10b–5); *Roeder,* 814 F.2d at 27 (same). *But cf. In re Wells Fargo,* 12 F.3d at 930 n. 6 (declining to reach the issue). A different rule would lead to the anomalous result of a Rule 10b–5 plaintiff being able to sue an individual insider selling his company's securities for the nondisclosure of material nonpublic information, but not being able to sue the issuer itself for failing to disclose the same information in connection with an offering.

tuting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). The threshold question is whether the *Wilensky* complaint, which sets forth claims under Sections 11 and 12(2) of the Securities Act, contains any "averments of fraud."

■ Fraud is not an element of a claim under either Section 11 or 12(2), and a plaintiff asserting such claims may avoid altogether any allegations of scienter or reliance. *See Shapiro*, 964 F.2d at 288; *Lucia v. Prospect St. High Income Portfolio, Inc.*, 769 F.Supp. 410, 416 (D.Mass.1991), *aff'd*, 36 F.3d 170 (1st Cir.1994). However, despite the minimal requirements of Sections 11 and 12(2), a complaint asserting violations of those statutes may yet "sound[ ] in fraud." *Haft v. Eastland Financial Corp.*, 755 F.Supp. 1123, 1126 (D.R.I.1991). For example, if a plaintiff were to attempt to establish violations of Sections 11 and 12(2) as well as the anti-fraud provisions of the Exchange Act through allegations in a single complaint of a unified course of fraudulent conduct, fraud might be said to "lie[ ] at the core of the action." *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.1985). In such a case, the particularity requirements of Rule 9(b) would probably apply to the Sections 11, 12(2), and Rule 10b–5 claims alike. "It is the allegation of fraud, not the 'title' of the claim that brings the policy concerns [underlying Rule 9(b) ] ... to the forefront." *Haft*, 755 F.Supp. at 1133; *accord Shapiro*, 964 F.2d at 287–88 (applying Rule 9(b) to Section 11 and 12(2) claims "grounded in fraud"); *Lucia*, 769 F.Supp. at 416–17 (same).

As the district court noted, the *Wilensky* complaint avoids grounding its Section 11 and 12(2) claims on any allegations of fraud. Although the complaint does assert that defendants actually possessed the information that they failed to disclose, those allegations cannot be thought to constitute "averments of fraud," absent any claim of scienter and reliance. Otherwise, any allegation of nondisclosure of material information would be transformed into a claim of fraud for purposes of Rule 9(b). In the circumstances, we hold that the *Wilensky* complaint was not subject to the pleading requirements of Rule 9(b).

**B. Whether the Shaw *Complaint Satisfies* Rule 9(b)**

■ The defendants' primary challenge to the sufficiency of the *Shaw* complaint under Rule 9(b) is that it fails to allege specific facts that would permit a reasonable inference that defendants had knowledge of information foretelling the financial results for the third quarter of fiscal year 1994 prior to the quarter's end. We limit our analysis to those allegations in the *Shaw* complaint that state a cognizable claim for securities fraud. The issue is thus whether the plaintiffs have sufficiently pleaded that defendants knew facts as of March 21, 1994 that indicated the third quarter was going to turn out as it did, and that the company would soon thereafter announce further restructuring actions necessitating an additional restructuring charge for the fiscal year. Although the question is close, we think that the complaint survives Rule 9(b) scrutiny.

■ This court has been "especially rigorous" in applying Rule 9(b) in securities fraud actions "to minimize the chance 'that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement, rather than in the hopes that the process will reveal relevant evidence.'" *Romani*, 929 F.2d at 878 (quoting *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir.1987)). We have emphasized that the particularity requirement cannot be avoided "simply through a general averment that defendants 'knew' earlier what later turned out badly." *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992). A securities plaintiff cannot plead "'fraud by hindsight.'" *Id.* (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978)). This means that a plaintiff may not simply contrast a defendant's past optimism with less favorable actual results, and then "contend[ ] that the difference must be attributable to fraud." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Rather, Rule 9(b) requires that the complaint "set[ ] forth specific facts that make it reasonable to believe that defendant knew that a statement

was materially false or misleading." *Greenstone*, 975 F.2d at 25 (collecting cases); *see also Serabian*, 24 F.3d at 361 (quoting *Greenstone* ).

Here, the complaint cannot fairly be characterized as resting on conclusory allegations of the defendants' knowledge. The plaintiffs provide a series of factual allegations relating to a combination of developments known to the company (*e.g.*, failing product pricing strategies, market resistance to new products, wayward compensation policies, failure to implement downsizing plans) that could have provided a basis for advance knowledge of the information disclosed on April 15, 1994.[38] These factual allegations, together with other aspects of the complaint discussed below, provide a basis for a reasonable inference that defendants knew facts by March 21 indicating that the third fiscal quarter would be disastrous, and that accelerated restructuring efforts requiring a further restructuring charge were likely to follow.[39] *Cf. Serabian*, 24 F.3d at 365; *In re Wells Fargo*, 12 F.3d at 931.

In additional support of their allegations of defendants' knowledge, plaintiffs assert that two insiders of the company, neither of whom is a defendant here, sold DEC stockholdings during the third fiscal quarter. One, the company's treasurer, sold 1,625 shares (68% of the officer's total holdings) on February 11, 1994. The other, the general manager and vice president of the company's personal computer business, sold 2,000 shares (20% of his position) on March 22, 1994.

◼ Of course, the mere fact that insider stock sales occurred does not suffice to establish scienter. *See Tapogna v. Egan*, 141 F.R.D. 370, 373 (D.Mass.1992). However, allegations of "insider trading in suspicious amounts or at suspicious times" may permit an inference that the trader—and by further inference, the company—possessed material nonpublic information at the time. *See Greenstone*, 975 F.2d at 26 (citing *In re Apple Computer*, 886 F.2d at 1117); *see also Rubinstein*, 20 F.3d at 169–70 (characterizing sufficiently suspicious trading as "presumptively probative of bad faith and scienter"). Here, the level of suspicion warranted by the alleged insider stock sales is marginal: the first sale occurred more than a month prior to the date of concern here (March 21, 1994); and the second sale, though made at what might be considered a "suspicious" time, involved a small (albeit not insignificant) percentage of the insider's total holdings of DEC stock. Nonetheless, we think that the plaintiffs' allegations of insider trading, inasmuch as they are at least consistent with their theory of fraud, provide some support against the defendants' motion to dismiss under Rule 9(b).

Finally, in testing the allegations of the complaint against Rule 9(b), we need not turn a blind eye to the obvious: the proximity of the date of the allegedly fraudulent statements and omissions to both the end of the quarter then in progress and the date on which disclosure was eventually made.

---

**38.** In asserting that defendants had direct knowledge of DEC's third quarter operating results as they developed, plaintiffs allege that "[m]ore so than the management of most companies, DEC's management, including the Individual Defendants, was virtually immediately cognizant of the Company's sales information" by virtue of the company's use of "a highly-efficient reporting system which allows the Company to forward sales and cost information to senior management virtually as sales are made." The defendants argue that these allegations should be viewed with skepticism and as the product of nothing more than "pure speculation." Speculation or not, we think that the plaintiffs' allegations of a "highly-efficient reporting system" may speak to the question of *how* defendants might have known what they allegedly knew, but absent some indication of the specific factual *content* of any single report generated by the alleged report-

ing system, do not independently provide a factual basis for inferring any such knowledge. On balance, we do not think that generalized allegations regarding the existence of an internal "reporting system" substantially assist a securities fraud complaint in overcoming the hurdle of Rule 9(b). *See Pitten v. Jacobs*, 903 F.Supp. 937, 949–50 (D.S.C.1995); *cf. Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir.1993) (refusing to credit "scanty" allegations concerning internal documents, absent indication of "who prepared the projected figures, when they were prepared, how firm the numbers were, or which ... officers reviewed them").

**39.** We reject defendants' argument that the complaint fails adequately to particularize the roles of the individual defendants in the purported fraud. *Cf. Serabian*, 24 F.3d at 367–68.

While the short time frame between an allegedly fraudulent statement or omission and a later disclosure of inconsistent information does not, standing alone, provide a sufficient factual grounding to satisfy Rule 9(b), *see Arazie*, 2 F.3d at 1467–68, there is nothing in Rule 9(b) that precludes consideration of such temporal proximity as a circumstance potentially bolstering the complaint's claims of fraud. *See Fecht*, 70 F.3d at 1083–84. On the facts as alleged in this case, we think that the proximity of the date of the allegedly misleading statements and omissions to the end of the ongoing quarter (and the date of eventual disclosure) provides some circumstantial factual support to be taken into account in determining whether the complaint pleads an adequate basis for inferring defendants' culpable knowledge.

We have no intention here of diluting the stringent mandate of Rule 9(b). But in determining the adequacy of a complaint under that rule, we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence. Rule 9(b) proscribes the pleading of "fraud by hindsight," *Denny*, 576 F.2d at 470, but neither can plaintiffs be expected to plead fraud with complete insight. We conclude that the portions of the *Shaw* complaint that survive Rule 12(b)(6) scrutiny also satisfy the particularity requirements of Rule 9(b).

## VI.

### Conclusion

The district court erred in dismissing the *Wilensky* and *Shaw* complaints in their entirety. Portions of both complaints survive Rule 12(b)(6), but *only* to the extent that they allege: (i) that the registration statement filed in connection with the public offering of March 21, 1994, failed to disclose material information in DEC's possession as of that date that would have alerted the market to the likelihood of disastrous quarterly results; and (ii) that the statement in the prospectus supplement as to the "adequacy" of

the restructuring reserve remaining as of March 21, 1994 was materially false or misleading.[40] We hold, however, that the *Wilensky* complaint fails to state a claim under Section 12(2) of the Securities Act as to DEC and the individual defendants. Furthermore, in light of the limited basis on which we permit the *Shaw* action to go forward, only the claims of the single named plaintiff who purchased DEC shares after March 21, 1994 may be reinstated, and the allegations in the *Shaw* complaint pertaining to the scope of the putative plaintiff class must be modified accordingly. Finally, the requirements of Fed.R.Civ.P. 9(b) do not apply to the *Wilensky* complaint as currently pleaded, and the surviving portion of the *Shaw* complaint does satisfy Rule 9(b). On remand, the district court may choose to require the plaintiffs to amend their complaints in accordance with these conclusions.

In closing, we note that although the issues of materiality and knowledge raised by the two complaints preclude terminating this litigation on the pleadings, nothing we say here is intended to foreclose the possibility that those and other issues, after discovery and an opportunity for factual development, might be susceptible to resolution on motions for summary judgment. To borrow wise words from one of our prior decisions: "Despite our conclusion that certain allegations survive threshold consideration, we note that plaintiffs remain a great distance from actually proving" any violations of the federal securities laws. *Serabian*, 24 F.3d at 365–66.

*Affirmed in part, reversed in part, and remanded. No costs are awarded.*

---

40. The district court did not state any independent reasons for dismissing the *Wilensky* plaintiffs' derivative claims under Section 15 of the Securities Act or the *Shaw* plaintiffs' claims under Section 20(a) of the Exchange Act and for common law negligent misrepresentation. Those claims should, therefore, be reinstated and permitted to proceed to the extent consistent with this opinion.