**In re CANANDAIGUA SECURITIES LITIGATION.**

**Nona VENTRY, on behalf of herself and all others similarly situated**

v.

**Richard SANDS, Lynn K. Fetterman, Canandaigua Wine Company, Inc.**

**BRICKELL PARTNERS, a Florida Partnership, on behalf of itself and all others similarly situated**

v.

**Richard SANDS, Lynn K. Fetterman, Canandaigua Wine Company, Inc.**

**Agnes BABICH, on behalf of herself and all others similarly situated**

v.

**Richard SANDS, Lynn K. Fetterman, Canandaigua Wine Company, Inc.**

**Nos. 95 Civ. 9633(MP), 95 Civ. 9729(MP) and 95 Civ. 10262(MP).**

United States District Court, S.D. New York.

Nov. 6, 1996.

Garwin, Bronzaft, Gerstein & Fisher by Noah S. Silverman, Bruce E. Gerstein, New York City, Wechsler, Skirnick, Harwood, Halebian & Feffer by Robert I. Harwood, Jeffrey M. Haber, Joel C. Feffer, New York City, Miller, Faucher, Chertow, Cafferty & Wexler by Marvin A. Miller, New York City, for Plaintiffs.

McDermott, Will & Emery by Steven P. Handler, Barbara R. Funt, New York City, for Defendants.

### OPINION

MILTON POLLACK, Senior District Judge.

Plaintiffs, purchasers of the securities of Canandaigua Wine Company, Inc. ("Canandaigua"), have brought suit against Canandaigua and two of its officers, Richard Sands and Lynn Fetterman, (collectively "Defendants") asserting securities fraud claims based on §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder by the Securities and Exchange Commission ("S.E.C."). Plaintiffs contend that misleading statements or omissions by Canandaigua and its officers artificially inflated the company's stock price until November 10, 1995, when the stock substantially dropped upon the report that fourth quarter 1995 earnings had decreased a mere $.01 per share from the fourth quarter 1994 earnings.

Defendants moved to dismiss the Consolidated Amended Class Action Complaint ("Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Pursuant to Rule 12(c), due to the factual matters outside of the complaint presented to and not excluded by the court, the motion was treated as one for summary judgment and disposed of as provided in Rule 56. The

parties were given a reasonable opportunity to present all material made pertinent to a motion by Rule 56.

For the reasons appearing below, summary judgment will be granted in favor of defendants and the complaint will be dismissed.

### I. Background

Canandaigua is one of the country's leading producers and marketers of branded alcoholic beverages; it produces and markets over 125 national and regional brands of alcohol, including such popular table wine brands as Almaden, Inglenook and Paul Masson. Canandaigua is the second largest supplier of wines, the fourth largest importer of beers and the eighth largest supplier of distilled spirits in the United States. Within the past several years, Canandaigua has aggressively expanded in the wine industry through takeovers of producers of popular name-brand varietal wines.[1] During this expansion period, Canandaigua's Class A common stock market price on the Nasdaq National Market rose from $15 per share in August 1991 to approximately $40 per share at the beginning of 1995.

On or about January 1, 1995, Canandaigua decided to embark on a new competitive price strategy "to increase its market share in the varietal wine market by introducing numerous new brands of varietal wines at substantial discounts to existing market prices." Complaint ¶ 33. To attract customers from competitors' brands the company priced its new brands approximately $1 to $2 below competitors' prices, a discount of at least 15% below competitors' prices, if not more. Joint Statement of Agreed and Disputed Facts, Pursuant to Local Civil Rule 3(g) ¶¶ 26, 32 ("3(g) Stat"). "The strategy was to attract price sensitive customers away from competitors' brands." *Id.* They believed that "by effectively starting a price war, they could trade the Company's short term profits and earnings to gain longer term benefits," Complaint ¶ 34, "and be well

---

1. Non-varietal wines are composed of a blend of grapes and are named after the European region where such wines are generally produced (e.g. Burgundy). Varietal wines are generally produced from and named after a single grape (e.g.

Zinfandel). Varietal wines tend to have higher prices and larger profit margins than non-varietal wines, and consumption of varietal wines has recently been on the rise.

positioned in the industry two or three years in the future." *Id.* At the time, Canandaigua was experiencing strong growth of its market share based on its recent acquisitions of Vintners International Company, Inc. (producers of Paul Masson and Taylor California Cellars) and the Almaden/Inglenook brands from Heublein, Inc.

In their 1994 10K filing with the S.E.C., defendants noted that they were undertaking a "reduction in prices" for their Taylor California Cellars brands as well as "new promotional programs" and "repackaging of selected products," but did not otherwise discuss below-market pricing of new products. 3(g) Statement ¶ 11. On January 12, 1995, in their 10Q filing with the S.E.C., the Company reported strong First Quarter 1995 results and attributed growth of its market share in branded beverage alcohol product net sales and unit volume to "our strategy of capitalizing on strong wholesaler relationships and expanding distribution and penetration of our growing portfolio of products." 3(g) Statement ¶ 14.

At some point in March or April of 1995, Canandaigua actually introduced its new packaging and several new product lines at prices that undercut the competition. At the time, Canandaigua was experiencing a strong level of growth in its overall business. On April 4, 1995, Canandaigua issued a press release announcing record earnings and net sales for its 1995 second quarter, which ended February 28, 1995. Within the release, Richard Sands, the President and Chief Executive Officer of Canandaigua, was quoted as saying that "overall strategy, which includes growth through acquisitions, has also resulted in internal growth in both net sales and unit volume of our branded products." 3(g) Statement ¶ 17. In its second quarter 10Q report to the S.E.C., Canandaigua ascribed a drop in overall gross profit as a percentage of net sales to "reduced gross profit percentages on the Company's table wine brands due to lower selling prices and higher costs of goods sold associated with some of these brands." 3(g) Statement ¶ 16.

On July 10, 1995, Canandaigua released its third quarter results; the company had continued to experience record levels of overall earnings and profits. Within a press release, Sands remarked that Canandaigua's "brand development strategy [was] continuing to generate excellent results" and that the company was "aggressively positioning both new and existing varietal table wine products to capitalize on our strong brand equity." 3(g) Statement ¶ 20. Meanwhile, the third quarter 10Q report to the S.E.C. revealed "increases in many of the Company's varietal table wine brands due to, among other things, line extensions and new product introductions." 3(g) Statement ¶ 18. In addition, Canandaigua repeated that an overall decline in gross profits percentage for the year was partially attributable to "lower selling prices and higher cost of goods sold associated with some of these [table wine] brands." 3(g) Statement ¶ 19.

On November 9, 1995, Canandaigua announced the results for its 1995 fourth quarter, ending August 31, 1995. Earnings and profits continued to achieve positive levels comparable to those of previous periods and above those of previous years. Net earnings in the fourth quarter of Fiscal 1995 were $10.4 million, or, $.52 per share on a fully diluted basis, as compared to $8.6 million, or $0.53 per share on a fully diluted basis, in Fiscal 1994. 3(g) Statement ¶ 22. These results did not, however, meet the projections of stock analysts, who had predicted record earnings and profits despite no such indication from Canandaigua. The next day, on November 10, the market price of Canandaigua's stock on the Nasdaq market dropped from $49.88 per share to $31.06 per share on trading volume of 4.8 million shares, well above the range of former daily trading. 3(g) Statement ¶ 27.

In a press release, Canandaigua attributed its earnings results to "higher than expected promotional costs and lower than expected gross profits in our California table wine business *as we successfully increased our market share* in the fast-growing and highly competitive varietal wine category." Compl. ¶ 65 (emphasis added). In a conference call with analysts Sands explained:

> Our gross profit margins were below expectations as our varietal business grew very nicely and most importantly our aver-

age price that we sell the product for came in below our expectations and analyst expectations.

\* \* \* \* \* \*

So, while we have defined pricing targets in each market for each SKU, the mix of sales by SKU and market by market is very difficult to predict, and we did not predict that we would sell as much as we sold in our lower price markets against lower priced SKUs as actually incurred.[2]

Calandra Aff., Ex. O, at 5.

One analyst gave his opinion that "[b]ecause the distribution system is both fractionated and long-tailed, the magnitudes of the sales incentives are not known until well after product is shipped to the customer," while another opined that "unexpected mix changes in the fourth quarter arising from the company's new pricing strategy and higher-than-expected grape costs" as the source of Canandaigua's diminished results. Silverman Aff. Ex. 14, 15.

The conference call allegedly represented the first time that Canandaigua had discussed the discount pricing plan for its new products, which Sands described as a "major attack" on competitors. Calandra Aff., Ex. O, at 23. Sands pointed out that the new varietal wine lines were introduced in the beginning of the third quarter and that consumer response (and therefore effects on sales, earnings and profits thereon) could not be gauged until they began replenishing inventory of the new lines in the fourth quarter. He did not, however, suggest (and plaintiffs do not allege) that Canandaigua lowered prices on its pre-existing products or did anything other than to introduce a new line of products at below market prices. Sands cogently explained Canandaigua's market pricing decision: "[i]f you are going to create a varietal business like [Canandaigua is] developing from television advertising, you would spend 10 times what [it] will spend through [its] sacrificing of gross profit and promotion." 3(g) Statement ¶ 26.

Plaintiffs contend, as if stumbling upon a merchant's prerogative for the first time, that by introducing these new products at low prices designed to gain increased market share, Canandaigua was "effectively starting a price war" thereon and gambling "short-term profits and earnings to gain longer-term benefits." Compl. ¶ 33. They further claim that in 1995 defendants were obligated to reveal publicly their successful marketing "discounting strategy" for new products in the interests of stockholders and investors but failed to do so, that defendants thereby "artificially inflated" the market price of Canandaigua's stock, and that this was a fraud on the market. Compl. ¶ 74.

## II. *Standards for Summary Judgment*

Rule 56(c) provides that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994). A genuine issue of material fact exists unless "no reasonable trier of fact could find in favor of the nonmoving party." *Taggart v. Time, Inc.,* 924 F.2d 43, 46 (1991). The party seeking summary judgment bears the burden of showing that there are no genuine issues of material fact and that the undisputed facts establish a right to judgment as a matter of law. *See Rodriguez v. City of New York,* 72 F.3d 1051, 1060 (2d Cir.1995). Moreover, in determining whether an issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). The moving party, however, may satisfy her burden if she "can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects*

---

**2.** Each variation and style of each product is assigned a different "SKU" (short for "stock-keeping unit") code.

*Foundation,* 51 F.3d 14, 18 (2d Cir.1995); *see also Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (burden satisfied if moving party shows that "little or no evidence may be found in support of nonmoving party's case").

## III. *Discussion*

■ In order to state a cognizable claim under Section 10(b) of the Securities and Exchange Act and Rule 10b–5 thereunder, a plaintiff must plead that "the defendant made a false statement or omitted a material fact, *with scienter,* and that plaintiff's reliance on defendant's action caused plaintiff's injury." *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 808 (2d Cir.1996) (emphasis added).

### A. *Duty to Disclose*

■ Mere non-disclosure of information will not necessarily give rise to 10b–5 liability even if the information was material; a plaintiff must also establish that the defendant had a duty to disclose. *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980). The Second Circuit in *Glazer v. Formica Corp.* elaborated that such a duty exists only where there is (1) insider trading, (2) a statute or regulation requiring disclosure, or (3) an inaccurate, incomplete or misleading prior disclosure. 964 F.2d 149, 157 (2nd Cir.1992). In short, there is no "affirmative duty of disclosure." *Id.* (citing *Backman v. Polaroid Corp.,* 910 F.2d 10, 12 (1st Cir.1990) (en banc)). Plaintiffs argue that the requisite duty to disclose arose here both as a result of prior misleading statements and pursuant to a regulation requiring disclosure.

### 1. *Duty to disclose due to prior misleading statements*

■ Plaintiffs' assertion that Canandaigua had a duty to disclose its promotional strategy on the new product line in order to cure prior misleading statements is easily dispatched. Defendants made no statement that could remotely be classified as being materially misleading because it was incomplete or rendered misleading by subsequent events. Notably, plaintiffs do not specify a single statement within Canandaigua's corporate filings or press releases that was untrue. Other than a general reference to promotional activity and "overall strategy" in the conduct of the business, they made no specification of their plans or activities thereunder. Plaintiffs in essence seek to revive an argument which this Circuit effectively foreclosed in *Philip Morris,* 75 F.3d at 810. In that case, the court found that even a previous, explicit statement by Philip Morris that it would focus on profits did not give rise to a duty to disclose to competitors, stock salesmen or pundits a promotional marketing plan that focused on market share. The court explained "that [*In re*] *Time Warner* [*Inc. Securities Litigation,* 9 F.3d 259 (2d Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994)] went nearly to the outer limit of the line that separates disclosable plans from plans that need not be disclosed, and that the allegations of this case are on the safe side of the line." *Id.* Noting that Philip Morris had also indicated that market share was an important corporate consideration and that Philip Morris had not "hyped" a specific plan, the court concluded that a "single, vague statement ... cannot have led any reasonable investor to conclude that Philip Morris had committed itself to a particular marketing strategy and had foreclosed all alternatives." *Id.*

Similarly, in this case, Canandaigua made no statement that indicates either a utilization or disavowal of any potential price discounting scheme and did not hype a specific plan. First, the instant discounting plan was not even implemented until the third quarter of 1995. The court in *Philip Morris* determined that consideration and later implementation of alternative strategies do not make statements of current strategy misleading absent some promise to maintain a current strategy, even if it had been previously detailed. 75 F.3d at 811. Furthermore, the language cited as corporate statements after March, 1995 could not lead any reasonable investor to conclude that Canandaigua was not introducing new products at a discounted price. In particular, plaintiffs highlight as misleading or as misrepresentations the fol-

lowing three second and third quarter statements attributable to Canandaigua:

[These results] demonstrate that our overall strategy, which includes growth through acquisitions, has also resulted in internal growth in both net sales and unit volume of our branded products. In addition, our overall strategy has led to improved operating margins in second quarter 1995 of 10.6% from 9.8% in the same period last year, reflecting increased operating efficiencies. Compl. ¶ 59.

Our brand development strategy is continuing to generate excellent results. We are aggressively positioning both new and existing varietal table wine products to capitalize on our strong brand equity. Compl. ¶ 61, 62.

Net sales and unit volume of the Company's varietal table wine brands for Third Quarter 1995 increased 34.6% and 37.6%, respectively, as compared to Third Quarter 1994, reflecting increases in many of the Company's varietal table wine brands due to, among other things, line extensions and new product introductions. Compl. ¶ 64.

None of these statements was remotely misleading or was later contradicted; their general emphasis on market share expansion goals is completely consistent with a discounting strategy. Indeed, the last two statements may be interpreted as suggesting that such a strategy exists.

■ Ultimately, plaintiffs point to no statement of the defendants that could even arguably be rendered misleading by omission of a discounting plan. Plaintiffs merely sound the familiar refrain that any comment by a corporation imposes an affirmative duty to disclose all marginally-related material information. There is no such obligation or duty. *See Philip Morris,* 75 F.3d at 810; *In re Time Warner,* 9 F.3d at 268 ("We do not hold that whenever a corporation speaks, it must disclose every piece of information in its possession that could affect the price of its stock"). This Circuit in *Philip Morris* has already rendered such contentions baseless.

#### 2. *Duty to disclose pursuant to statute or regulation*

■ Alternatively, Plaintiffs argue that Canandaigua had an affirmative duty to disclose its promotional strategy pursuant to Item 303 of Regulation S–K under the Securities Act of 1933 and the Securities and Exchange Act of 1934. 17 C.F.R. § 229.303 ("S–K 303").[3] S–K 303 outlines the disclosure required in the "Management's discussion and analysis of financial condition and results of operations" section ("MD & A") in certain corporate filings. In general, S–K 303 encompasses discussion of three subjects: (i) liquidity (S–K 303(a)(1)), (ii) capital resources (S–K 303(a)(2)) and (iii) results of operations (S–K 303(a)(3)).

Plaintiffs focus on S–K 303(a)(3)(ii) and Instruction 3 to Paragraph 303 as requiring disclosure in the present case of the manner in which the Company went about its efforts to increase the market share of newly introduced products. These provisions direct the registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" and to include "descriptions and amounts of … matters that would have an impact on future operations and have not had an impact in the past." Plaintiffs contend that when Canandaigua priced its new products below market level, it created a "trend or uncertainty" covered by these provisions. Assuming that S–K 303 might create a duty to disclose under 10b–5,[4] that is a far cry

---

**3.** Both parties spend some time arguing the applicability of Items 101 and 303 of regulation S–K to 10Q reports. As defendant notes, Item 101 applies only to annual 10K reports, *In re Seagate Technology II Securities Litigation,* [1990 Transfer Binder] Fed.S.E.C.L.Rep. (CCH) ¶ 95,427, at 97,164, 1990 WL 134963 (N.D.Cal.), and the complaint alleges a failure to disclose in the Company's 10Q reports, not its 10K reports. SK–303, however, does impose disclosure requirements for both 10Q and 10K reports. *See*

17 C.F.R. § 229.303(b) (mandating that interim period financial statements "shall include a discussion of material changes in those items specifically listed in paragraph (a)"). The upshot of the debate is that S–K 303 is a potential source of disclosure duties in this case, while S–K 101 is not.

**4.** It is far from certain that the requirement that there be a duty to disclose under Rule 10b–5 may

from an assumption such as the one made by plaintiffs that pricing a company's new product below the market level of competitors creates a "trend or uncertainty" obligating disclosure in the market and to competitors.

### a. Disclosure policies behind S–K 303

Plaintiffs' reliance on S–K 303 poses difficult interpretive questions. As the First Circuit has noted, determining the appropriate disclosure required by federal securities laws and regulations "is not easily separable from normative judgments about the kinds of information that the securities laws *should* require to be disclosed, which depend, in essence on conceptions of materiality." *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1202–03 (1st Cir.1996). The difficulty in interpreting S–K 303 is compounded by the broad and ambiguous language of the item and the S.E.C.'s decision to leave the standard of disclosure "intentionally general, reflecting the Commission's view that a flexible approach elicits more meaningful disclosure and avoids boilerplate discussions, which a more specific approach could foster." Financial Reporting, Exchange Act Release, No. 34–26831, 1989 WL 258977 (S.E.C.) *2 (1989) ("S.E.C. Release").

It goes without saying, however, that there are cognizable, definitive limits to the disclosure required by S–K 303, and Canandaigua's discounting strategy simply does not fall within those limits. Beyond the ambiguous terms "trends and uncertainties" and "material impact," S–K 303 and the supporting S.E.C. interpretive release yield a clear indication of the type of information contemplated as part of MD & A disclosure.

First, S–K 303 and the S.E.C. Release repeatedly stress that disclosure is required only when events, trends and uncertainties are likely to have a material affect on the "financial condition" or "results of operations" of a registrant. Disclosure is limited to "trends or uncertainties that have had or … will have a material … impact on net sales or revenues or income *from continuing operations*," (S–K 303(a)(3)(ii)) and "events and uncertainties that would cause reported financial information not to be necessarily indicative of future *operating results* or of future *financial condition*" (S–K 303(a), Instruction 3). The S.E.C. similarly describes the purpose of S–K 303 as to provide a "material historical and prospective textual disclosure enabling investors and other users to assess the *financial condition and results of operations* of the registrant, with particular emphasis on the registrant's prospects for the future." S.E.C. Release, *4 (emphasis added).

Second, the MD & A analysis is explicitly centered on financial condition. Instructions to S–K 303 specify that discussion "shall be of the financial statements and of other statistical data" (S–K 303, Instruction 1) and explain that the purpose of MD & A analysis shall be to provide "information relevant to an assessment of the financial condition and results of operations of the registrant as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources" (S–K 303, Instruction 2). Moreover, the S.E.C. portrays the role of S–K 303 as filling the "need for a narrative explanation of financial statements." S.E.C. Release, *4.

■ This emphasis on financial condition and operational results suggests that information concerning management decisions such as pricing plans properly falls outside of S–K 303 disclosure. There is a significant

---

be satisfied by importing the disclosure duties from S–K 303. Plaintiffs concede that S–K 303 does not support a private right of action on its own but claim that S–K 303 creates "a 'duty to speak', which, when combined with materiality, creates a § 10(b) duty to disclose." Pl.Mem. ¶ 27. The authorities cited by parties are contradictory. *Compare Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 607–08 (N.D.Cal.1991) ("Thus, demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b–5. Such a duty to disclose must be separately shown.") *with Wallace v. Systems & Computer Technology Corp.*, 1996 WL 195382, *8–9 (E.D.Pa.1996) ("Item 303(b) is important, for if disclosure of these costs is warranted under this regulation, then [there may be] a duty to disclose that information."). Since I find no duty to disclose the marketing strategy under S–K 303, I need not decide on the appropriate relationship between S–K 303 and 10b–5 actions.

difference between events and trends affecting "operations," such as the closure of a plant or the increase in costs of raw materials, and competitive marketing strategies and plans. The former are information concerning the extrinsic operational situation that management faces, and needs to be disclosed, while the latter are competitive business judgments that management makes to improve the business, and need not be disclosed.

More importantly, courts have been sensitive about forcing a company to damage its own interests as well as those of its shareholders by revealing competitive information. *See Philip Morris*, 75 F.3d at 809 (expressing concern about "interpreting the securities laws to force companies to give their competitors advance notice of sensitive pricing information")[5]; *In re Verifone Sec. Litig.*, 784 F.Supp. 1471, 1483 (N.D.Cal.1992) (expressing wariness of requiring provision of "information to competitors . . . which would be to the detriment of the corporation. To impose a disclosure obligation for such information simply cannot be in the best interests of investors and shareholders."), *aff'd*, 11 F.3d 865 (9th Cir.1993). It is inherently absurd to impose on companies in highly competitive, consumer-based industries an affirmative duty to disclose *to competitors* sensitive pricing and marketing decisions. It would defy reason (and long-established business practices) to interpret a regulation concerned with analyzing "operations" and "financial condition" and furnishing a "narrative form of the financial data" as requiring such disclosure. S–K 303's mandate to disclose material "trends and uncertainties" does not contemplate furnishing competitors with an analytical blueprint of a company's business strategies.

*b. Canandaigua's marketing strategy*

The propriety of this interpretation of S–K 303 is bolstered when one considers the particularly routine nature of the business strategy pursued by Canandaigua. In March or April of 1995, Canandaigua introduced new products and new packaging in order to mount an "aggressive" "major attack" on the competition to gain market share for those products. Calandra Aff., Ex. O, at 22–23. In addition, they priced these new products at a discount to "attract price-sensitive consumers away from competitors' brands." Compl. ¶ 33. The undisputed facts show that this strategy had little initial impact on Canandaigua's financial condition or results; Canandaigua had record profits in the third quarter.[6] In fact, Canandaigua did not experience a significant drop off beyond the range of reasonably possible results in net sales, earnings or revenues over the second, third and fourth quarters of 1995.[7] More importantly, Canandaigua's strategy to increase market share seems to have been at least an initial success; the company experienced a 43% increase in varietal wine volume and posted a 2% increase in market share, while their main competitor, Gallo, showed a varietal wine volume decrease. Silverman Aff., Ex. 14.

■ Plaintiffs argue that disclosure was required regardless of the fact that Canandaigua's policy succeeded in both expanding

---

5. The determination here is not inconsistent with the Second Circuit refusal to hold marketing strategies per se immaterial, despite concern over protection of competitive information. *See Philip Morris*, 75 F.3d at 810. The Second Circuit did not suggest that consideration of the sensitive, competitive nature of the information to be disclosed was inappropriate when interpreting the law; indeed, the opposite seems to be true. *See id.* at 809 (expressing concern over forcing companies to reveal competitive information). The *Philip Morris* court simply found that factor not persuasive enough to determine that "such [marketing] plans, by their very nature, are not material for purposes of securities fraud"; in the present case, I do find that factor persuasive in finding that such plans, by their nature, do not have to be *affirmatively disclosed* pursuant to S–K 303.

6. Gross profit in Third Quarter 1995 increased to $63.3 million from $42.8 million in Third Quarter 1994.

7. According to Canandaigua's 10Q reports, second, third and fourth quarter earnings were $10.0 million ($.50 per share), $10.6 million ($.53 per share), $10.4 million ($.52 per share) respectively; gross profit margins were 27.3%, 28.4% and 27.3% respectively; net sales were $210.9 million, $222.8 million, $229.3 million respectively. 3(g) statement ¶¶ 22, 24; Silverman Aff., Ex. 3, 4, 11.

market share and maintaining profitability.[8] Plaintiffs assert that the disclosure of the strategy would have presaged not the actual shortfall of profits as compared to previous periods or years, but rather the discrepancy between actual profits and *analysts' projections* of profits. There is no duty under 10b–5 or S–K 303 to disclose an expectation that analysts' projections will be wrong. *See Shaw v. Digital Equipment Corp.*, 82 F.3d at 1210 ("There is always some risk that the quarter in progress at the time of an investment will turn out for the issuer to be worse than anticipated."). Moreover, analysts based their projections on their own (not management's) assumption that Canandaigua would affirmatively *raise* prices to offset rising costs despite the fact that no such plan was indicated by any previous statement or action by Canandaigua. Silverman Aff., Ex. 20, 21. Instead, in pursuit of market share, Canandaigua lowered its prices without consulting the investment analysts who follow the Company or disclosing its strategy to defendants' competitors. Defendants committed no wrong. In fact, they acted normally in the best interests of their permanent shareholders; they owe no duty to analysts who wantonly predict that they will choose another strategy.

Nonetheless, plaintiffs contend, without factual support, that the marketing strategy should have been disclosed pursuant to S–K 303 because "a material effect on the registrant's financial condition or results of operations" was "reasonably likely to occur." S.E.C. Release, *8. As proof of this materiality, plaintiffs point to the risks posed by the pricing plan: the profit margin for each discounted bottle of wine would be affected (Compl. ¶ 35), competition would exist between new and existing products (Compl. ¶ 37) and an adverse "skew" of "the mix of wines the Company sold in its new product lines" could arise (Compl. ¶ 38). All of these risks were posed by the pricing plan simply by virtue of the fact that it was a marketing strategy for a consumer-based marketing company; practically every decision involving either prices or products poses the same risks. Plaintiffs also present the circular argument that the pricing plan could result in materially reduced earnings and profits "if the Company did not obtain the necessary volume levels and product sales mix." Compl. ¶ 51. Of course, this is true of every business decision. Plaintiffs theory of the scope of material events under S–K 303 would require disclosure of every single significant product and price decision. Besides being absurd in a competitive market, broadening disclosure requirements in this manner would effectively "bury ... shareholders in an avalanche of trivial information." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

Plaintiffs may not circumvent the settled doctrine that there is no affirmative duty to disclose information by stretching the language of S–K 303 beyond its legitimate scope. Canandaigua simply introduced new products at below market prices and successfully expanded its market share thereon. Although profit margins on the new products may have been "squeezed" compared to those of the existing products (the prices of which are not alleged to have been discounted), Canandaigua continued to make substantial profits in the third and fourth quarter of 1995 substantially equivalent to earlier periods. In fact, Canandaigua had record profits and earnings in the third quarter of 1995. Applying S–K 303 in this instance would drastically expand the duty to disclose and take the unprecedented step of requiring companies to release affirmatively their sensitive pricing and marketing information to their competitors. It is clear that Canandaigua's competitive pricing policy was not a "trend or uncertainty" expected to materially impact on "operations" or "financial condition" within the ambit of S–K 303 disclosure.

### B. *Failure to adequately plead scienter*

The plaintiffs' claims also fail because the complaint does not adequately meet the obligatory scienter requirement of section 10(b) of the Securities and Exchange

---

8. Ironically, as defendants note, if they had made the suggested disclosure, they likely would have been subjected to suits from sellers disappointed by Canandaigua's record profits in the second and third quarters of 1995.

Act of 1934. Rule 9(b) of the Federal Rules of Civil Procedure requires that "the circumstances of fraud or mistake be pleaded with particularity," but allows conditions of mind such as scienter to be "averred generally." Fed.R.Civ.P. 9(b). In order to avoid abuse of this relaxed specificity requirement, however, plaintiffs are required to "allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). This requirement may be satisfied either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* If plaintiffs' attempt to plead scienter by showing recklessness or conscious misbehavior, then "the strength of the circumstantial allegations must be correspondingly greater." *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) (en banc).

Plaintiffs contend that their allegations show that (1) defendants knew of the discounting strategy, (2) defendants knew of the "various risks and potential adverse effects" of the strategy, and (3) defendants "knew or were reckless in not knowing that their statements … did not adequately disclose critical facts about their strategy." Pl. Mem., at 30–31. At the same time, however, plaintiffs claim that this third, critical contention is "self-evident." Pl.Mem., at 31. In other words, the purported circumstantial evidence of consciousness or recklessness in failing to disclose is the fact of non-disclosure itself; this is the type of "broad and conclusory" allegation that is considered "meaningless." *Shields,* 25 F.3d at 1129 (citing *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 119–20 (2d Cir.1982); *see also Acito v. IMC-ERA Group Inc.,* 47 F.3d 47, 53 (2d Cir.1995) ("conclusory allegations of fraud do not satisfy the pleading requirements of Rule 9(b)"); *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir. 1986). In fact, as noted above, plaintiffs have failed to show particularized facts that Can-

andaigua made any false or misleading statement or omission.

Beyond this, plaintiffs fail to raise the essential strong inference of fraudulent intent. Scienter in 10b–5 actions is more than simple conscious nondisclosure. The requisite scienter is an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). Although the Second Circuit has maintained that recklessness is a form of scienter in "appropriate circumstances," *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 46 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), "mere garden variety breach of a known duty does not constitute such recklessness." *Gross v. Damon Corp.,* 1995 WL 138612, at *3 (S.D.N.Y.). "Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care.' " *Rolf,* 570 F.2d at 47; *see also Healey v. Chelsea Resources, Ltd.,* 947 F.2d 611, 618 (2d Cir. 1991) (plaintiff must show "such recklessness as to amount to scienter"); *In re Fischbach Corp. Securities Litigation,* 1992 WL 8715, at *5 (S.D.N.Y.) (finding appropriate circumstances for recklessness as a form of scienter when there is "wilful blindness").

Plaintiffs argue that they have alleged enough facts to suggest Canandaigua's knowing non-disclosure of potentially material information. Even assuming that this is true, their allegations do not provide the basis for drawing the requisite inferences of fraud. As noted above, there were legitimate competitive business reasons for defendants to keep their own counsel on the pricing of their new product line. Furthermore, plaintiffs have alleged neither any statement that is false or misleading, affirmatively or through omission, nor any facts that suggest defendants knew they had a duty to disclose the marketing strategy pursuant to statute or regulation. It is not enough for plaintiffs to allege that defendants knew that the disclosures did not reveal the pricing strategy or that the omitted information was material, for that alone does not suggest "conscious misbehavior or recklessness." *Shields,* 25

F.3d at 1128. Absent some allegation that defendants knew or were highly unreasonable in not knowing that they were doing something illicit, the complaint fails to adequately plead scienter. *See Mayer v. Oil Field Systems Corp.*, 803 F.2d 749, 756 (2d Cir.1986) (scienter requires "at least knowing misconduct"); *Reiss v. Pan American World Airways, Inc.*, 711 F.2d 11, 14 (1983) ("conscious failure to disclose" not sufficient, "there must be proof that the non-disclosure was intended to mislead."). There is absolutely nothing to suggest that Canandaigua was "promoting a fraud." *Shields*, 25 F.3d at 1129.

### C. *Section 20(a) claim against Sands and Fetterman*

Without a primary violation of the securities laws under § 10(a), there can be no secondary, or derivative, violation under § 20(a). *See Shields*, 25 F.3d at 1132. Thus, dismissal of the § 10(b) claim will necessarily carry dismissal of the § 20(a) claim.

### IV. *Denial of Discovery*

 Defendants' request that judgment be postponed until discovery is ordered pursuant to Rule 56(f) of the Federal Rules of Civil Procedure is also denied. To succeed, an affidavit requesting additional time to conduct discovery in order to respond to a summary judgment motion must explain "the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994); *see also Genao v. Board of Education of the City of New York*, 888 F.Supp. 501, 504–05 (S.D.N.Y.1995) (citing *Sage Realty v. Ins. Co. of North America*, 34 F.3d 124, 128 (2d Cir.1994).

There is no genuine issue of fact before the court material to the issues dispositive to the motion for summary judgment: the defendants' lack of a duty to disclose the allegedly withheld information and the failure of the allegations to give rise to a strong inference of fraudulent intent. To satisfy the requirements of Rule 56(f), plaintiffs' affidavit must establish a reasonable expectation that the requested discovery will raise genuine issues of fact as to these issues. None of the requested information, however, involves a heretofore unidentified prior, misleading statement and no additional discoverable facts will impact on the scope of the duty to disclose pursuant to S–K 303. Furthermore, plaintiffs have not identified any specific discoverable information that will raise the obligatory suggestion of fraud. Thus, plaintiffs have not specified "how the facts sought are reasonably expected to create a genuine issue of material fact." *Paddington Partners*, 34 F.3d at 1138. Plaintiffs may not premise further discovery on a meritless, groundless claim in order to seek the "in terrorem increment of the settlement value." *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975)).

### V. *Conclusion*

Defendants are entitled to the grant of summary judgment and the complaints are dismissed, with costs to defendants.

So ordered.